1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

CHIESI USA INC. and            :      Civil No.
CHIESI FARMACEUTICI S.P.A.,           19-cv-18564-MCA

                   Plaintiffs, :

             v.

                    :      TRANSCRIPT OF
MSN PHARMACEUTICALS INC.,              MARKMAN HEARING
MSN LABORATORIES PRIVATE
LTD., MSN LIFE SCIENCES         :
PRIVATE LTD., ENDO PROCUREMENT
OPERATIONS LIMITED, and
GLAND PHARMA LTD.,              :

             Defendants.
--------------------------------x

                     Via Zoom Teleconference
                     June 22, 2021

BEFORE:

    THE HON. MADELINE COX ARLEO, U.S.D.J.

                     Reported by:
                     CHARLES P. McGUIRE, C.C.R.
                     Official Court Reporter

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

CHARLES P. McGUIRE, C.C.R.

2

APPEARANCES:

GIBBONS PC
One Gateway Center
Newark, New Jersey 07102
BY: ROBERT C. BRADY, ESQ.
And
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
BY: ANGUS CHEN, ESQ.
    ELIZABETH J. MURPHY, ESQ., and
    HAILEY S. VERANO, ESQ.
Attorneys for Plaintiffs

JASON B. LATTIMORE, ESQUIRE
55 Madison Avenue
Morristown, New Jersey 07960
And
ARENT FOX LLP
1717 K Street, NW
Washington, D. C. 20006-5344
BY:  RICHARD J. BERMAN, ESQ.
     JANINE A. CARLAN, ESQ.
     BRADFORD C. FRESE, ESQ.
Attorneys For Defendants MSN Pharmaceuticals Inc.,
MSN Laboratories Private LTD., MSN Life Sciences
Private Ltd., and Endo Procurement Operations Limited

ROBINSON MILLER
110 Edison Place
Newark, New Jersey 07102
BY: JUSTIN T. QUINN, ESQ.
And
SCHIFF HARDIN LLP
233 South Wacker Drive
Chicago, Illinois 60606
BY: IMRON T. ALY, ESQ., and
    ARUN J. MOHAN, ESQ.
Attorneys for Defendant Gland Pharma

CHARLES P. McGUIRE, C.C.R.

3

(The following takes place via Zoom teleconference)

THE COURT: All right. Good morning, everyone.

We're here for a claim construction hearing in the matter of Chiesi v. MSN Pharmaceuticals.

Can we begin with appearances of counsel, please?

Can everyone hear me?

MR. CHEN: Yes, Your Honor. I apologize.

This is Angus Chen from Quinn Emanuel for Plaintiffs. I was just waiting for my co-counsel, Mr. Chevalier, but if he's not here, I'm happy to proceed.

THE COURT: Okay.

MR. BRADY: Angus, it's Bob Brady. I'm here instead of Charles. I was trying to unmute my computer.

MR. CHEN: Okay. Go ahead, Mr. Brady, please.

MR. BRADY: Good morning, Your Honor.

Robert Brady from Gibbons on behalf of Plaintiffs, along with Mr. Chen and his colleagues, who already introduced themselves.

THE COURT: Okay. Good morning.

MR. LATTIMORE: Good morning, Your Honor.

Jason Lattimore, the Law Office of Jason Lattimore, on behalf of the MSN and Endo Defendants.

I have co-counsel with me from Arent Fox who are handling the presentation today, and they'll introduce themselves.

CHARLES P. McGUIRE, C.C.R.

4

THE COURT:  Okay.

MS. CARLAN:  Good morning, Your Honor.  This is Janine Carlan from Arent Fox.  We represent Endo and MSN.

And before my colleagues introduce themselves, I wanted to introduce representatives from our client here today.  We have Lawrence Brown and Gina Gencarelli (ph) from Endo, and we have Dr. Reddy from MSN.

And I'll turn it over to my colleagues to introduce themselves.

MR. BERMAN:  Good morning, Your Honor.  It's Richard Berman of Arent Fox on behalf of the MSN and Endo Defendants.

THE COURT:  Okay.

MR. FRESE:  And good morning, Your Honor.  This is Bradford Frese from Arent Fox on behalf of the MSN and Endo Defendants.

THE COURT:  Okay.

MR. QUINN:  And good morning, Your Honor.  This is Justin Quinn from Robinson Miller for the Gland Pharma Defendants.

With me on the line are Imron Aly from Schiff Hardin, Arun Mohan from Schiff Hardin, and a client representative from Fresenius Kabi, Ryan Daniels.

THE COURT:  Okay.  Is that everyone?

MR. CHEN:  Your Honor, this is Angus Chen of Quinn

5

Emanuel.

THE COURT:  Sure.

MR. CHEN:  Just to complete our introductions, I'm sorry, along with me from the Quinn Emanuel firm is Ms. Elizabeth Murphy and Hailey Verano.

From the client Chiesi is Mr. Michael Gordon, the general counsel, along with his colleagues, who for ease of presentation are only participating by audio.

And then if it's okay with your Honor, I have a handful of summer associates from Quinn Emanuel who are not participating on camera but observing today.

THE COURT:  Okay.  We all have summer associates. I have my summer interns as well.

So, this is a warning:  This better be very exciting, because we have no trials this summer for interns to watch, so I have built this up as the highlight of their summer.  So I expect drama, I expect "My Cousin Vinnie" moments, or otherwise, you know, we're not going to get lawyers to come to work for us if we can't give them good summer programs.  So that's my hope today.

All right.  So we're proceeding by Zoom by consent of the parties, I take it, and I'm happy to do it this way.

And I understand that there has been an agreement about timing.  We're roughly a little over five minutes or so after 10.  I understand the parties have agreed on a

CHARLES P. McGUIRE, C.C.R.

6

three-hour time frame.

MR. CHEN:  That's correct, Your Honor.

THE COURT:  And any agreement on how that time is going to be split?  Is it going to be one side or the other?  Will there be rebuttal left over?

I may have questions at the end of this three hours, and I will not take away from your time, because I know that a lot of work and effort has been put into getting this under the three-hour limit.

So maybe, Mr. Chen, you can tell me:  How is the breakup going to be?

MR. CHEN:  Yes, Your Honor.  We didn't actually discuss the exact breakdown, but it was our understanding it would be roughly half allotted to each side.

But in terms of the order of presentation, the parties worked together and agreed that we would present the terms based on buckets of patents.  The method-of-treatment patents would go first, then what we call the high purity patents, and then the '208 patents are the third category.

Within that, each side will present separately on terms, with a few exceptions where arguments overlap or there's some, you know, overlapping discussion.  So -- if that's okay with your Honor.

THE COURT:  That's fine.  So just so I understand, it's going to be, buckets of patents will be the order of

CHARLES P. McGUIRE, C.C.R.

7

presentation.  Does that mean there will be a half hour, then a half hour, will it be like three half-hour segments, or will it be an hour and a half and then an hour and a half?

MR. CHEN:  I suspect it will be less than that, because, as an example, we will start off addressing the two method-of-treatment terms, "treating" and "preventing."  Then the Defendants will respond.  Then we'll switch to another method-of-treatment term, "chronic treatment."  Then they'll respond.

THE COURT:  Will there be agreement as to timing, how much time for each argument, or should we keep time?  Do we have a rough idea of what the time is?  You can go back and forth.  I'm happy to give everyone extra time if they need it, but I also don't want one side to manipulate the time and take more time than the other side needs, given the three-hour time frame.

MS. CARLAN:  You're right, Your Honor.  We intend to split the time half and half, probably an hour and a half per side, and in that case, we will simply be watching our times to make sure that we don't use too much on any particular term.

THE COURT:  Okay.  Fair enough.

MS. CARLAN:  But we will be going back and forth between Plaintiffs and Defendants.

CHARLES P. McGUIRE, C.C.R.

8

THE COURT:  Okay.  And Amy Andersonn, I should introduce everyone to because she is really the glue that holds everything together around here, and she will be keeping track of time as well.  If there's any dispute, she'll be the official timekeeper, side by side.

All right.  Any other issues before we begin?

MR. CHEN:  That's it from Plaintiffs.

THE COURT:  Thank you for the excellent briefing. I've reviewed it over the last couple of days, and I'm prepared to use that as a guide for myself as well.

I have one threshold question, and that has to do with the motion for leave to file an amended answer and counterclaim.  Does that have any impact on the arguments today?

I guess I should ask Mr. Chen, since he's opposing it.

MR. CHEN:  Your Honor, I don't think so, because I think that even if that motion is granted, the disputes are still live, and if it's denied, the MSN Defendants still have other contentions that relate to this.

But I'll let them speak as to their view because it is their motion.

MS. CARLAN:  Your Honor, the motion to add counterclaims will not have an effect one way or the other on the claim construction hearing.

CHARLES P. McGUIRE, C.C.R.

9

THE COURT:  Okay.  That sounds good.

All right.  So, let's start.  It's around 10:10.

Mr. Chen?

MR. CHEN:  Your Honor, that's a tough billing to live up to.  I'm not sure we'll rise to the level of "My Cousin Vinnie," but I'll turn it over to my colleague, Ms. Murphy.

THE COURT:  Okay.  Thank you.

MS. MURPHY:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. MURPHY:  Can you see my screen?

THE COURT:  I can.

MS. MURPHY:  Good morning.  I'm Liz Murphy from the law firm of Quinn Emanuel, here on behalf of Chiesi, along with my colleagues from Quinn Emmanuel and the Gibbons law firm.

So, some brief intro on the parties.  Chiesi is a global specialty pharmaceutical company based in Parma, Italy as well as Cary, North Carolina.  They have developed and bring to market innovative drugs, particularly drugs for the hospital setting, one of which we'll be talking about today.

We have two groups of Defendants here, the MSN group of Defendants and the Gland group of Defendants.  I call them the group of Defendants because MSN is affiliated

CHARLES P. McGUIRE, C.C.R.

10

for purposes of their ANDA product with Endo, and Endo, in turn, is affiliated with Par Pharmaceutical.  Gland Pharma is affiliated with Fresenius Kabi.

We have eight patents at issue in this case.  They are grouped, as the Plaintiffs alluded to before, by type of patent.

We have three method-of-treatment patents.  They are generally directed to various methods of treatment involving the active ingredient, cangrelor.

We have the cangrelor patent, which is the earliest expiring and only at issue as to the Gland Defendants.

And then finally, we have four patents that we refer to collectively as the high purity cangrelor patents, and we have provided expiration dates for each of the patents.

On the bottom right hand of this screen, we have noted the expiration dates for Your Honor, and the purpose of noting that is to just show that the earliest generic is no later than December 22nd.

So, cangrelor is Chiesi's product at issue in this case.  Cangrelor, of course, is the active ingredient.

Here, we have the indications and usage. Cangrelor, the active ingredient, is a P2Y12 platelet inhibitor, and what P2Y12 refers to is a particular receptor

11

on the flat surface of the platelet, and it's involved in platelet aggregation or platelet pumping. Cangrelor is a platelet inhibitor because it inhibits that effect, so it inhibits platelet aggregation, it inhibits pumping, it inhibits blood from clotting.

Provided here, because the indication is a little bit dense, we have some definitions for you for reference.

The most important one we'll be talking about today is percutaneous coronary intervention, also abbreviated as PCI.

Kengreal is a drug that is used during PCI, and what PCI is is a medical procedure meant to improve blood flow to the heart, and the way it's done is that a catheter, this long, thin, flexible tube, is inserted into a patient's blood vessels and advanced, pushed all the way to the coronary arteries, which are the blood vessels that supply the heart muscle with the blood.

And then on the next slide, we have a helpful illustration here. This is the PCI receptor. We have the catheter here, and we have a device at the end of it which is called the stent. And the idea here is that the stent is breaking up a plaque here or a blockage, and the point of this is to increase blood flow to the heart.

Now, this is a procedure that is potentially lifesaving, it's very important, and you want it to go well.

CHARLES P. McGUIRE, C.C.R.

12

But in the course of advancing a device into a tiny coronary blood vessel, you can appreciate that there might be some disturbance to the vessel tissue, and when that happens, the body's natural response is to clot, and you'll see here the clot formation, and, of course, platelets are involved in the clot formation.

And you don't want to have a clot formation when using that device in the coronary blood vessel because that can lead to further complications, like stent thrombosis, which is basically clotting around the stent; myocardial infarction, which is another word for heart attack; you can have ischemia-driven or repeat coronary revascularization, which means you have to go back into the blood vessel to re-establish blood supply, and it can lead to death.

So during PCI, you want to prevent clotting, and you do that by administration of Kengreal.

Kengreal is unique among other P2Y12 inhibitors in that it has a very fast onset and offset, and what that means is that it has a fast onset, it takes about two minutes to reach full activity, and when you compare it to other oral P2Y12 inhibitors, they take 30 minutes to reach their optimal effect.  You can imagine, if you're operating on a patient's coronary artery, a minute can make a huge difference, so you want to take action fast.

Kangreal also has a rapid offset, which refers to

the time that it takes for the patient's platelet coagulation, for the platelet aggregation levels to get back to normal.  And Kangreal also has a very rapid offset, on the order of several minutes to an hour.

Again, with these other oral P2Y12 inhibitors, it takes hours or days for the platelet levels to level off.

We've provided for you here the video of cangrelor in action.  So, on the left-hand side, you have a blood vessel that has an injury, and you see a clot forming here. This blood vessel does not have cangrelor; cangrelor has not been applied here.  On the right, cangrelor has been applied, and you'll see there is a clot starting to form, but the clot is inhibited by cangrelor or Kengreal, and as a result, the blood flow is not impeded.

So this is what Kangreal does in a patient with PCI.

Okay.  These are the parties' proposed terms for construction.  On the left-hand side, you'll see that Chiesi has proposed one term of construction in terms of the high purity cangrelor patent group.

Defendants collectively have proposed at least nine terms of construction, and of those nine terms, Defendants are not proposing construction but rather arguing indefiniteness.  And even within those terms that they're arguing indefiniteness, Defendants take different positions.

CHARLES P. McGUIRE, C.C.R.

14

For example, with high purity cangrelor, MSN is proposing a construction, whereas Gland is saying indefinite, and with respect to "reducing the incidence of," Gland is saying indefinite, whereas MSN is not taking a position on indefiniteness for their construction.

Okay.  So, the method-of-treatment, both treatment patents.  Generally, we take the position or we do take the position that plain and ordinary meaning should govern in the construction of these terms, and Federal Circuit case law says claim terms are generally given their ordinary and customary meaning, which is the meaning they would have had to a person of ordinary skill in the art at the time of the invention.  So the terms are entitled to the full scope of that plain and ordinary meaning unless there is some reasonable expectation to redefine it or to disavow claim scope, and neither of those exceptions apply here.

Here's an overview of the issues.  These are all of the terms implicated with the method patents, "treating," "preventing," "chronic treatment," and then these later terms are among that Defendants argue are indefinite.

I'm going to start with "treating" and "preventing."  We take these because I'm going to address them together.

We believe that the plain and ordinary meaning should govern each of these phrases.

CHARLES P. McGUIRE, C.C.R.

15

"Treating" appears in three of the patents:  In the '448, the '265, and the '780.  "Preventing" appears in the '448 and the '265.

And as you can see, MSN and Gland take the position that they should have specific construction, and oppose our plain and ordinary meaning.

So, the Federal Circuit says you can consult technical dictionaries for the plain and ordinary meaning of the claim terms, and that's what we've done here.  We've relied on Stedman's Medical Dictionary for the definition of "treat" and "prevention," and the definition of "treat" is "to manage a disease by medicinal, surgical or other measures; to care for a patient medically or surgically." Prevention is "action so as to avoid, forestall, or circumvent a happening, conclusion or phenomenon."

So we think these are pretty straightforward. They reflect the plain and ordinary meaning to a person of skill in the art at the time of the invention.

Defendants with respect to "treating" take the position that there should be an element of cure or heal in the proposed construction.

We oppose that because it's not in the dictionary definition that we've applied, and I think the parties agree that treatment does not require a cure or heal in all instances, so for that reason, we would oppose inclusion of

16

that language.

Defendants also take the position that treatment must occur after the onset of a disease or condition.

We oppose that because it's not present in any of the dictionary definitions that the parties have provided, and we believe that onset is a concept that is irrelevant to the definition of treatment.  What matters with treatment is that you're managing the disease or condition and not whether and when -- when the onset occurred.

For "preventing," Defendants take the position that preventing must keep an event from happening.

We oppose this because we think that it is inconsistent with the claim language.  For example, the '448 patent recites claims that say preventing an ischemic event, the ischemic event being mortality.

Now, obviously you can't prevent mortality from ever happening.  So we believe our proposed construction, which is the plain and ordinary meaning, should encompass this concept of forestalling, if not preventing indefinitely.

Okay.  And the other issue between the two parties' proposals is that Defendants appear to take the position that you can't have any overlap in meaning between these two different claim terms.

The Defendants are arguing that our proposed

CHARLES P. McGUIRE, C.C.R.

constructions are wrong because they overlap meaning.

We disagree.  We haven't seen any authority that supports Defendants' position that overlap is precluded.  We have seen authority that says claim terms are presumed to have different meaning, which is what we propose here.

If you look at the dictionary definitions, they have different meanings.  Do they overlap?  Maybe a little bit.  For example, if you're treating a stent thrombosis, you may be preventing a myocardial infarction down the road.

In that sense, we think that the plain and ordinary meaning as reflected by these dictionary definitions should govern.

And with that, I'll turn it over to Defendants.

MS. CARLAN:  Thank you.

And if we could pull up Defendants' slide presentation, actually, I'd like to start with the introduction, just briefly, starting with slide four, I'd like to introduce you very briefly to MSN and Endo.

And starting with MSN, MSN is deeply involved in research and development, has created over 350 active ingredients and over 250 drug formulations to provide to customers all over the world.  MSN holds over 650 patents.

Now, MSN developed the drug product and submitted the ANDA for the generic version of cangrelor which is at issue in this case, and MSN has partnered with Endo on this

18

proposed drug, and, if approved, Endo will market this drug in the United States.

Next slide.

Endo has a long history in the United States and now has a portfolio of both branded and generic products. Endo is currently making a Covid-19 vaccine candidate in its Michigan facility.

The next slide is Gland, and I would actually like my colleague that's representing Gland to jump in and introduce Gland briefly, and then I'll take it back over.

MR. ALY:  Thank you very much, Ms. Carlan.

Imron Aly here, representing Gland Pharma, and, Your Honor, just by way of introduction for now, and then I'll speak more on the issues later, but the introduction to the company, Gland is a internationally well-recognized pharma company with high standards for making drugs and recognition within the country.  Companies around the world have therefore sought out its expertise.

For an example, of one of the Covid vacancy -- vaccines being made domestically within India, Gland Pharma was chosen as one of those six companies to help develop the drug internally as a trusted resource.

Thank you very much, Ms. Carlan.

MS. CARLAN:  Thank you.

If we could go to slide 10 and just briefly

CHARLES P. McGUIRE, C.C.R.

19

discuss cangrelor.

While Plaintiffs have introduced cangrelor, Defendants have a little bit more information about it.

It's important to note and to understand that this drug is only administered in the hospital setting.  This is because it's an IV product.  And it's also only administered during a PCI procedure like stent implantation.

This drug was developed by AstraZeneca in the late 90's, it was sold to The Medicines Company in 2003, and then after it was FDA-approved, it was sold to Chiesi in 2016.

Next slide.

Now, one of the indications that The Medicines Company had proposed early on was for reduction of thrombotic cardiovascular events in certain patients during PCI, and notably, they tried to get this indication for reduction of events, but the FDA did not approve that indication.

Next slide.

So here's the approved indication.  Plaintiffs have shown this as well.  After failing to achieve approval in the first attempt, cangrelor was approved as Kengreal with the approved indication of use as an adjunct to PCI for reducing the risk of certain conditions in certain patients.

Now, this indication is different from the earlier proposed indication, and clearly the FDA distinguished

CHARLES P. McGUIRE, C.C.R.

20

between reduction of thrombotic events, which is not approved, and reducing the risk, which was approved.

And on Chiesi's slide six, showing the indication they approved, they highlighted a number of words and gave definitions, and here, you can see their slide six.

Interestingly, they did not highlight and define the word "adjunct."  That means that cangrelor is used in addition to, to assist the primary therapy, but it is not an essential part of the therapy.

Now, if we can go to Defendants' slide 16.

So, as Plaintiffs discussed, there are two main patent groups that we're talking about today, formulation patents, and use patents.  We call them the use patents; Plaintiff has referred to them as the method patents.  This is the group that we'll be discussing next.

There is one overarching theme with respect to the use patents, and that is the meaning of all of these terms that are claim terms in various patents, and these represent the parties' goals when using cangrelor.  These terms are distinct from one another, and as noted earlier, even the FDA has distinguished between these in reducing terms.

So, Defendants contend that all of these terms shouldn't have separate and distinct meanings, and Chiesi is effectively equating them in some manner and blurring the lines between them.

CHARLES P. McGUIRE, C.C.R.

21

So, to explain further, we'll go into the disputed terms now, "treating" and "preventing."

Next slide.

So at the outset, you know, we want to discuss Defendants' construction, and it looks like we all agree that curing and healing is not a requirement in Defendants' constructions.  That's true.  So the dispute here, it sounds like from what Plaintiffs have highlighted, is whether or not this is going to occur after onset of a disease or condition.

So, here, what should be highlighted as far as Defendants' construction if you're looking back at Plaintiffs' highlights would be providing medication, and it would be after onset of a disease or condition.

And treating, really, when it comes down to it, is giving medication after onset of a disease.  Whether it heals or cures or even alleviates, all of those are wonderful, and we hope that that happens, but we need to ensure that we give medication after onset.

So now let's move to slide 21, and this is just a road map as to why Defendants are right on their proposed construction for treating, and that is what we're supposed to do in claim construction:  Looking at the claims themselves, looking primarily at the claims and the intrinsic evidence in the specification for the patent.

CHARLES P. McGUIRE, C.C.R.

22

So, moving to slide 23, let's look at the word "treating" within the claims in the patents that are in issue here.

So, we have "treating" appearing in the '448, '265, and '780 patents in various claims, and we've highlighted them here to show that these different claim terms all together are "treating," "reducing incidence of," or "preventing" or "reducing the risk," and the various claim terms are distinct and different reasons for administering cangrelor.

And as the case law shows, the Board of Regents case, which we pointed out, different claim terms are presumed to have different meanings.

Now, Chiesi has mentioned this Los Angeles Biomedical Research case and relied heavily on overlap as being permitted.  They admit that they do overlap.  With their proposal, the terms all overlap with each other.

Here, our terms are distinct.

But that Los Angeles Biomedical case, first of all, was on appeal from the PTAB, so the Court used this different standard, this broadest reasonable interpretation in construing the claims, rather than the Phillips standard that we are using in our case.

But even if we do look at the Los Angeles case, and the reason it came out the way it did, where some

CHARLES P. McGUIRE, C.C.R.

23

overlap was actually permitted by the Court, was because the competing construction that the patent holder was trying for had no basis in the patent.  It wasn't supported by the specification.  It was contradicted by the prosecution history.

And that's not the case we have here.  Defendants have support for their construction of "treating."  Plaintiffs do not.  Defendants have support, intrinsic support for both "treating" and "preventing."

And it's also clear from this case, Los Angeles, looking at the rest of the opinion, that most courts -- the courts are saying that interpretations that render some portion of the claim language superfluous are disfavored, and also, the bottom line is that claim construction that gives meaning to all of the terms of the claim are preferred over one that does not do so.

So, the other aspect of this claim language where all the terms are together here, they're separated by the word "or."  And that's significant.  It has meaning here.  And the Federal Circuit has consistently interpreted the word "or" to mean the terms are alternative to each other.

Next slide.

So, another key piece of evidence, the intrinsic evidence; and, importantly, this goes back to our earlier statement about an overarching dispute.

CHARLES P. McGUIRE, C.C.R.

24

The intrinsic evidence demonstrates that each one of these claim terms is a different goal to the patentees. This is key for all of these claims that have methods of use.

So, here, in the '448 excerpts, the patentee stated that the goals of the methods are treating, reducing the incidence of, and/or preventing.

And the patents, the other patents have similar language to this.

So these different goals are further differentiated from each other in that the specification also states that treating, reducing, and preventing may have different -- they may use different doses of cangrelor in each one.  So they're described here as separate goals, and you do different things depending upon what goal you're trying to achieve.

The other thing I'll note with this intrinsic evidence that we are relying on is the patentee here used the words "and/or" in the specification; you see that listed here.  And, significantly, the patentee chose to draft the claim language to say only "or," not "and/or," and this is yet another indication directly from this intrinsic evidence that the claim terms, "treating," "preventing," "reducing," are all different from each other, they are alternatives, and they should be construed in a way to

CHARLES P. McGUIRE, C.C.R.

25

reflect that, as Defendants have proposed.

Next slide.

So, looking at the extrinsic evidence, you know, Plaintiffs refer to their dictionary definitions as saying nothing about, you know, onset of disease or, you know, their terms -- their proposal is exactly like the definition.

But if you look here, you can see that this construction is -- our construction is reflected in these definitions where they reflect treating as an attempt to cure or alleviate a disease or condition that has already manifested in the patient.

Now, let's go to slide 27.

This is, you know, just looking at Chiesi's proposed construction, it suffers from a number of problems, including not providing clarity to the claim terms and then lacking support from the patents themselves.

Next slide.

So one reason that Chiesi's construction doesn't fit with the patents is because it contains this language regarding surgery for a patient or managing a disease.

All the use patents that are at issue here are directed to administering cangrelor, and that's to a patient, not dealing with surgery and not just generally managing disease.

26

Next slide.

So, another reason besides having no connection to the patent is that there's no clarity with these constructions that Plaintiffs are proposing.  Managing or caring for a disease -- managing or caring for a patient is very broad, and it really could cover a host of things that are not contemplated by the patent, and really, it makes it unclear with respect to what this is referring to.  Is this proposal referring to treating?  Is it preventing?  Is it before or after a condition arises?

So we may be left with more confusion after claim construction if we're taking Plaintiffs' proposal.

Now, let's move to slide 31.

The extrinsic evidence that Chiesi points to doesn't fit within the patents it discussed.  I also want to point out that we didn't hear anything about intrinsic evidence in their presentations.

So, one important thing about extrinsic evidence.  The Federal Circuit has cautioned that heavy reliance on the dictionary divorced from intrinsic evidence risks transforming the meaning of the claim term into the meaning of some term in abstract, out of context, and the context is supposed to be the specification.

So I'd like to move on to "preventing," if we can go to slide 33.

CHARLES P. McGUIRE, C.C.R.

27

So this dispute has a lot of similarities to disputes that we have regarding "treating," and Chiesi's proposed construction should be rejected for many of the same reasons.

Let's go to slide 38.

And here, look again directly at the claim terms. These we've seen before, and again, they're highlighted, and they have that "or" in between.  Again, these are showing different goals for administering cangrelor, supporting Defendants' definition.

Next slide.

Now, the intrinsic evidence that Defendants point to in addition to that key piece of evidence that talks about the goals being different that we looked at before with respect to treating, there is additional intrinsic evidence regarding "preventing," and here, "preventing" is described as prophylaxis by the patentee.

Let's go to slide 41.

So, one of the problems that Chiesi's proposal has is, it's untethered to the patent; it doesn't help clarify the terms, just like we saw with "treating."

This construction that they have with action to avoid and the word "forestall" actually allows the disease to occur, and that construction is not supported by the intrinsic evidence, and we didn't see any in Chiesi's

CHARLES P. McGUIRE, C.C.R.

presentation.

Next slide.

Chiesi is muddying the water here with its construction.  Is this construction describing "preventing"?  Is it describing "reducing the incidence of"?  It's just -- this is unclear.

Take a look -- let's go to slide 44.

Chiesi does point to intrinsic evidence in its briefing.  It didn't mention it today in the presentation, but here, Chiesi points to the '265 patent to the claim at column 8 and basically says that this supports them.

But column 8 actually calls out a window of time here, saying stent thrombosis is prevented during this time.

And what's important here, looking at claim 26, is that then the patentee specifically claims that time frame.

So when the patentee wanted to say that it can be prevented during certain time frames, they did so, and here, they're using the words "preventing stent thrombosis is prevention during PCI."  In other words, what they're telling us is, they're keeping stent thrombosis from happening during PCI.

That fits exactly within Defendants' construction, not Plaintiffs'.

And next slide.

Chiesi talked about the extrinsic evidence.

29

Again, we need to caution what the Federal Circuit has said: It needs to be tied somehow to the patents.  It needs to be within the scope.

This doesn't help them.  What Chiesi has done here is cut and pasted the first definition from Stedman's Medical Dictionary and they've used that generally for their construction.

But they don't have a tie to the patent here.  So they have improperly transformed the meaning of the claim term into the meaning of the term in the abstract, out of its particular context.

Now, further, in Chiesi's own -- in its own dictionary, you can see there are some alternative definitions here that specifically are directed to disease, to avoiding it, and just to keep it from happening once the disease has occurred.

So, these other definitions, which are straight from the same reference, are in line with the patent and also with Defendants' proposal.

The next slide.

So, just to conclude on these, Defendants' construction of these terms for "preventing" and "treating" provide clarity, they're in line with the teachings of these particular use patents, and Chiesi's construction just introduces confusion.  Where is the line?  It's unclear with

CHARLES P. McGUIRE, C.C.R.

30

respect to other terms and divorced from this application, and thus, we ask that Defendants' construction be adopted.

Thank you, and I will turn this back over.

THE COURT:  Mr. Chen, do you want to respond, briefly, to any of the arguments just made by Defendants?

MR. CHEN:  I believe Ms. Murphy will be handling that.

THE COURT:  Okay.

MS. MURPHY:  If I may.  Thank you, Your Honor.

Before we turn to chronic treatment, I just want to address a few points made by Defendants' counsel.

Nowhere in their presentation did I hear any legal authority that would require "treating," "preventing," and "reducing the incidence of" to have distinct, meaning nonoverlapping, meaning.  Certainly each of those phrases have a different meaning, as the dictionary definitions we cited to for the plain and ordinary meaning reflect different definitions.  So we don't think that we're doing anything improper.  Defendants haven't cited any intrinsic evidence or any legal authority that would require nonoverlapping meanings amongst those terms.

And as I alluded to before, it particularly makes sense in the context of prevention.  You're talking about treating or preventing.  You're treating a cause, you're preventing further complications - for example, a heart

31

attack, or even death.

And really, Defendants' issue is with the dictionary definitions that we provided.  We didn't come up with these constructions out of thin air.  We're advancing the plain, ordinary meaning.  The Federal Circuit says you can look at technical dictionaries to inform that, and that's what we've done.

Finally, with "preventing," we do cite intrinsic evidence to support our construction of plain and ordinary meaning.  We think that the plain and ordinary meaning have to encompass the concept of forestalling, because, for example, the '448 patent claims, which are intrinsic, recite preventing mortality.  So it makes no sense to indefinitely prevent mortality, as Defendants' construction would require or envision.  So we think that our proposal does fit the intrinsic evidence.

So now I'll turn to "chronic treatment," which is another claim term from the method of treatment patent. It's from the '052 patent.

The '052 patent is directed to a method of transitioning a patient from cangrelor during PCI to administration of one of those other oral P2Y12 drugs we were talking about before, like ticagrelor.

"Chronic treatment" appears only once in the claims preamble, and it's our position that it should not be

32

treated for claims limitation.

Defendants think that the term is limiting, and we have reasons to disagree with that, which I'll go into.

But here's the claim, the representative claim in the '052 patent, claim 1.  You'll see here we have the claim's preamble, which recites the method of transitioning the patient from cangrelor during PCI to administration of ticagrelor for chronic treatment.

I note that "chronic treatment" appears only once in the preamble, it does not appear anywhere in the recited steps that follow, so it doesn't provide any antecedent basis for the recited steps, and the recited steps are the invention.

So it's our position, and we think it's well supported by the claim language, that "chronic treatment" is not part of the invention, it's not necessary to understand the meaning of these steps that are recited here, and it need not be construed for that reason.

Again, here, we've broken the claim down.  So as I said, this invention is about transitioning a patient from cangrelor during PCI to a loading dose of ticagrelor, and that transition is recited in these four steps.  These first three steps talk about cangrelor during PCI.  The fourth step is administering an oral dose of ticagrelor wherein the oral dose comprises a loading dose.

33

So in other words, once you've administered that loading dose of ticagrelor, the transition is complete. Chronic treatment is something that might occur after, may occur outside of that, but it's not part of this invention, and for that reason, we do not think it needs to be construed.

And what does the specification say about chronic treatment? It doesn't say very much. It only mentions "chronic treatment" three times, and they are reproduced up here, and each time, it's just interchangeable with maintenance treatment.

And if you dig deeper into the intrinsic record -- this was from the file history. It gives a little bit more context to what is referred to as maintenance treatment, which the patent says is also chronic treatment. And maintenance treatment is just a daily dose. "BID" means twice daily; it just means that you're taking ticagrelor twice daily for an indefinite period of time. It's distinguished from a loading dose.

So, remember, if you look back at the claim language, you've achieved transition once you've administered that loading dose of ticagrelor. The chronic or maintenance treatment that happens after that is not part of the invention and should not be construed.

And with that, I will turn it over to Defendants'

CHARLES P. McGUIRE, C.C.R.

34

counsel.

MR. FRESE:  Good morning, Your Honor.  My name is Bradford Frese, I'm from the firm of Arent Fox, and I'm going to be discussing the "chronic treatment" term.

As Ms. Murphy pretty succinctly pointed out, the parties differ on whether the preamble is limiting and what "chronic treatment" means if the preamble is limiting.

Really, what is at issue here is whether the '052 patent claims are infringed when a physician administers a single oral dose of ticagrelor concurrently or sequentially with cangrelor, or whether the claims method requires the physician to do so as part of transitioning a patient to ongoing administration with ticagrelor.

If we can go to slide 50.

A preamble is generally limiting if it recites essential structure or steps, or if it's necessary to give life, meaning, and vitality to the claim.

Now, Ms. Murphy focused mostly on the essential structure or sets and pointed out that "chronic treatment" doesn't occur in the rest of the claim.

That's true.  But it does give meaning to the claim.  It does give life, meaning, and vitality.

But really, both prongs are met by the preamble here.  There's a central structure in the preamble, and it provides life, meaning, and vitality.

CHARLES P. McGUIRE, C.C.R.

35

Next slide, please.

First, the preamble does recite an essential structure here.  We've grayed out the preamble here, as you can see, and if you look at the method steps, they all recite administering but don't recite who is the object of that administration, who is receiving the administering.

The preamble provides that structure.  If you can ungray the preamble, it specifically recites, "a patient."  The administering is done to "a patient," and thus, it provides some amount of essential structure for the claim.

If you can highlight that.

Thank you.

It also defines what PCI is.  All of the method steps use the language "PCI" as that's actually defined in the preamble.

Can you highlight that, please?

Can we go to the next slide, please?

Further, a preamble can breathe life, meaning, and vitality into a claim if it provides meaning to other terms in the claim.  And that's what the preamble does here:  It shows why one is performing the method steps, how one is performing the method steps, and what that loading dose language means.

Next slide, please.

The preamble and specification together really

36

show why one is using the claimed method.  It's to transition a patient from cangrelor to ticagrelor for chronic treatment.  This is consistent with the specification, which tells us that administering a P2Y12 receptor inhibitor can transition the patient to chronic or maintenance treatment with the same P2Y12 receptor inhibitor.

Likewise, if you're administering a loading dose of a P2Y12 receptor inhibitor, such as ticagrelor, it can be followed by one or more subsequent doses of the same P2Y12 receptor inhibitor, so it's part of transitioning a patient to continuing treatment.

Next slide, please.

The preamble also shows how one uses the claimed method; that is, transitioning a patient to administration of ticagrelor for chronic treatment from administration of cangrelor during PCI implies stopping cangrelor administration at some point and starting ticagrelor administration.  Now, this can be done concurrently or sequentially, but either way -- which means there may be some overlap between the two, but either way, you're stopping one therapy and starting the other.

This is consistent with the language of claim 8, which talks about the claimed methods further comprising administering more oral doses of ticagrelor subsequent to

37

the loading dose; that is, it's transitioned in the same process.

Next slide, please.

Now, in step four of the claim, it talks about administering a 180-milligram loading dose of ticagrelor, and those words "loading dose" in that sentence are significant because they indicate an initiation of chronic treatment.  This is consistent with the labeling, the FDA-approved labeling for ticagrelor, which is sold under the trade name Brilinta.  Plaintiffs pointed to this in their presentation as well, but notably, it says to initiate Brilinta treatment with a 180-milligram loading dose and then to continue treatment with 90 milligrams.  That is, they're part of the same course of treatment.

Next slide, please.

So then the issue becomes, what does chronic treatment mean, since it's limiting in the preamble, and it means treatment on a long-term, ongoing basis.

Next slide, please.

This makes sense in the context of the claims. First off, it's clear that you're administering ticagrelor for treatment on a long-term, ongoing basis per Defendants' construction, whereas, if we substitute Plaintiffs' construction into the claim, it refers to some issues, such as surgical management, that are not necessarily relevant to

CHARLES P. McGUIRE, C.C.R.

38

the claim language.

Next slide, please.

Now, in their presentation, they talked about chronic treatment not being part of the invention, and in their opening brief, they put forward that "chronic treatment" refers to maintenance therapy that occurs after the loading dose.

This wasn't the construction they proposed in the joint claims construction and prehearing statement, and we believe it's been waived, but even then, there's no basis for saying that the plain and ordinary meaning of "chronic treatment" leaves out the loading dose.

Next slide, please.

The specification, for instance, indicates that a loading dose is followed by one or more subsequent doses. Likewise, claims 8 and 9 also show that the loading dose and maintenance doses are both part of claim 1's method of transitioning a patient because they say that that method further comprises administering more oral doses of ticagrelor, and then claim 9 further limits that to say that the oral doses comprise 90 milligrams of ticagrelor. That, again, mirrors the dosing of ticagrelor from the Brilinta.

Next slide.

Thus, looking at the preamble as a whole, the term "chronic treatment" is limiting. The preamble not only

CHARLES P. McGUIRE, C.C.R.

recites structure and steps for the claim, but that "chronic treatment" language gives life, meaning, and vitality to other terms in the claim, such as the loading dose language, and "chronic treatment" should be interpreted to mean treatment on a long-term, ongoing basis, while Plaintiffs' construction is incongruent with the remaining contents of the claim.

And with that, I'll turn it over to Plaintiffs' counsel.

Thank you.

MS. MURPHY:  Your Honor, may I briefly address the --

THE COURT:  Yes.

MS. MURPHY:  Thank you.

So I guess first off, I'll note that Defendants' counsel seems to agree with me about transitioning, and as we've shown before, transition is achieved by the administration of the loading dose in claim 1.

I also found it significant that -- the Defendants' arguments that chronic treatment is essential to breathe life and meaning into the claim.

Nowhere in their argument do they actually rely on the term "chronic treatment" in the preamble for this proposition.  They are focused on these other terms.

We disagree that these other terms render the

40

preamble essential because we don't think that it's necessary to have "patient."  You understand you're administering intravenously cangrelor to the patient based on the specification.

And to the extent percutaneous coronary intervention, PCI, is recited in the preamble, it's recited again later, but it's really an abbreviation.

So, we note that "chronic treatment" is not even part of their argument.  The preamble is limiting, and we nonetheless disagree that the preamble is essential.  We mention it's set forth fully and intrinsically in these recited steps.

As for the dependent claims, they still don't recite chronic treatment, so it's not like chronic treatment -- chronic treatment is not providing antecedent basis to the dependent claims, and for that reason, we don't believe it requires construction.

If the Court is inclined to construe it, we would oppose any construction that expands these claims to require treatment on some long-term, ongoing basis because we think that it's outside the scope of the invention.

And with that, I believe we've agreed to turn it over to Defendants to talk about the next set of terms.

MR. ALY:  Good morning, Your Honor.  Imron Aly, representing Gland.

CHARLES P. McGUIRE, C.C.R.

41

And as counsel just said, we've switched the order.  Defendants are going to go first on the next set of terms.  These are for the reducing terms, and, Your Honor, that is because we will show today they are indefinite, and we have the burden of proof to show indefiniteness, which we'll do on the reducing terms.

For the slides, which we can show on the screen, we'll start, here we see slide 61 is the introduction, and, Your Honor, it will be, for the record, slides 61 through 79 when we're looking back at the transcript someday for the reducing terms and indefiniteness.

And, Your Honor, if you have questions along the way, we can build that into our time, please, rather than waiting for them at the end, if Your Honor believes that would be helpful.  Happy to address them.

THE COURT:  Got it.

MR. ALY:  To identify the issue, we'll go to slide 63, please, and just look at the claim language on the top of the screen that's being shown here, and it's highlighted as "reducing the incidence of"; that's the claim term that we're talking about.

In the context of this claim, it's a method of for this purpose reducing the incidence of an ischemic event. That's a heart attack-related event in a patient undergoing the PCI, and counsel for the Plaintiffs described how that

CHARLES P. McGUIRE, C.C.R.

42

works and what that even looks like.

The question now that's a legal question is, how do we know when the incidence has been reduced, and if the claim, as we submit, is directed to one individual patient, then the claim is directed to an individual.  There is no way to know whether the incidence was reduced in one patient or not.  They either had the ischemic event or they didn't.  There's no way that you can go back and look for that patient and say, well, I wonder if your risk was reduced or not in your individual case.  This is not a technicality; this is a legal issue where the Plaintiff, the patentee, chooses what words to put in the claim, and if there's no way to know the boundaries of how to accomplish what they've claimed, that makes it indefinite.

And that's the challenge here.  In one line, Your Honor, if the claim is directed to an individual, which is a legal question, then it is indefinite.

Go back to slide 62 for the legal issues here, which is a threshold question:  Should we do this now, Your Honor, or should we wait until sometime later?  The answer to that question, we submit, is, we should do that now.  That's why we're bringing it up.

But we do have three reasons, Your Honor, to do so.

One, that the question presented today is part and

43

parcel of claim construction.  It's a pure question of law. If the claim is directed to an individual, that's our argument, then that makes it indefinite, as we'll see.

And the Plaintiffs are trying to change the claim to say it's not directed to an individual, it's actually directed to a patient population, a larger group of population of subjects and not one, and that's their way of fixing the claim.

But that's a legal issue to say, well, what does the claim actually cover?  Is it one, or is it many?

And just like claim construction itself, as we see in the first bullet point here, indefiniteness is presented as a pure question of law, part and parcel of claim construction, particularly in this case.

The second reason, Your Honor, to address indefiniteness at this stage is, there are no experts, and Plaintiffs make this very clear in their briefing as well, there is no expert testimony on this issue.

And what that shows is that either that helps the Defendants here, because it shows there is no fact dispute that is going to change the pure question of law; it's completely ripe now, there is no need for experts, because the dispute is based here on intrinsic evidence, and in our briefs, we cited case law that shows experts are not required for indefiniteness in the first place.  It's a

44

legal issue, primarily. It can be based on underlying questions of fact when they are introduced, but here, Plaintiffs did not introduce any such question of fact, so it's a legal question.

The third reason, Your Honor, for indefiniteness to be addressed now is, it's based on the specification and a disconnect between what the Plaintiffs here put in the patent specification on the one hand and what they have in the claim language on the other. And that disconnect is what makes the claims indefinite. The specification is not changing and the claims are not changing. So this is as good a phase of the case as any for how to address this set of claims. It's not like it's going to knock out every claim in the Plaintiffs' case; they've still got 150 asserted to this day. But the point here is that if there is an opportunity to address these issues in this type of case, when we are saying that there's no meaning at all to the claim as opposed to disputing different meanings, there is no reason or way to discern what the boundary of this claim is, what is covered and what is not, that is what the Supreme Court has said is indefinite, and that is what we're applying here, and therefore, in the District Court level, as in the second bullet point, we can address this issue now. It's basically one of those cases where it's practically unavoidable to address it now because it's

45

hand-in-hand with the claim construction issue of, overall, is the claim directed to an individual or to a population.

The bottom line here, Your Honor, Your Honor has the discretion to consider it now or later for indefiniteness, but these reasons, we suggest, should be enough to say, let's address this now.  There's nothing that says Your Honor cannot address these issues now as part of claim construction, which is how they're naturally raised.

Now we'll go to the next slide, slide 63.

And here, to identify this issue, what is the claim directed at?  Is it one patient, or is it many?

This claim itself -- let's look at the claim term itself on the top of the screen.  That provides the context.

Here, if you look at, Your Honor, the second line, it says, "in a patient."  Now, if we stop there, the Plaintiff says that could mean one or more, and I'll address that in a moment.  That's in the Plaintiffs' response brief.

But if we look two more lines ahead, the same claim says, "the patient," and now we're in a very clear legal issue area where, once there's the use of the word "the," that word reference to the word "the" means it refers back to one particular patient.  That's the antecedent basis rule, and one case that described it in the context of statutory construction, and the others have applied it in patent law, but the Federal Circuit in statutory

CHARLES P. McGUIRE, C.C.R.

46

construction did this in <u>Warner-Lambert v. Apotex</u>, 316 F.3d 1348 at 1356, a 2003 case, and that stands for the proposition, it is a well established rule of law that using the word "the" makes a reference to a particular individual, not the whole group.

Looking at the same slide here on the Plaintiffs' construction, that is what we're seeing here where the Plaintiffs' construction introduces several new terms, and I'll show them as highlighted on slide 65.

Here, Your Honor, on slide 65, the Plaintiffs' construction, if they are proposing here is to address this individual claim issue, even though that we've shown and we will show that the claim is directed to the individual, what the Plaintiffs recognize is, there's no way that's taught in the patent how to know if the risk or the incidence was reduced in one particular patient.

So what we see here is, in this slide, the Plaintiffs have to add the phrase, "in a specified population."  So it's the people falling ill here, and it's in a specified population.

So, right here is the issue, which is the claim construction issue, but the implication is for indefiniteness:  Can a claim written to an individual be required to mean a population?

We say no, that is wrong.  It rewrites the claim.

CHARLES P. McGUIRE, C.C.R.

47

It's a fundamental tenet of claim construction law that claims should not be rewritten in a Markman proceeding to save the claim or to save the Plaintiffs' patent.

And as a practical question here, it really should be addressed now, because, if the Plaintiffs' set-forth construction is adopted, that's a legal question, then it will be covering the population. That's what it says here. That will introduce, potentially, other indefiniteness issues. But right now, the central issue is, if the claim is directed to an individual, and if Plaintiffs are wrong about this population introduction of that term into the claim, then we've got the indefiniteness argument.

THE COURT: Can I ask you a question?

MR. ALY: Of course.

THE COURT: You talk about in a specified population. Doesn't that relate back to the ordinary meaning of incidence?

MR. ALY: Of incidence? It could, Your Honor. But if we're talking about incidence, if the claim had said in a population, the incidence was reduced, that would make more sense.

THE COURT: But doesn't the ordinary definition of incidence refer to a population as opposed to an individual, so their construction is consistent with ordinary meaning?

MR. ALY: No, Your Honor, and there, I'd say no,

CHARLES P. McGUIRE, C.C.R.

48

Your Honor, because the incidence could be the event to occur, so the incidence happening or not happening is what's reduced, and in the individual, we don't know if that --

THE COURT:  Where do you get that definition or that construction of incidence --

MR. ALY:  Here --

THE COURT:  -- referred to the number of new cases in a specified population.

MR. ALY:  It could, Your Honor, but in the context of the claim, since it's referring to the individual patient later, in the way we're looking at it, Your Honor -- I'll give you two answers.  One answer is, the way we're looking at it, the incidence should be a reduction of the incidence, and as I said, that's by looking at the claim itself here.

THE COURT:  So now you're referring back to an individual.  What I'm saying is, of course it's reducing disease or death or whatever it says then happens, but all I'm saying is, specified population refers back to incidence.  Incidence talks about population.

MR. ALY:  Right.  Under that view about incidence being a population, that would be the same indefiniteness argument, but now saying that the part of the claim referring to the incidence is referring to a group, but then the claim is still specifying to the patient.  That's the -- the reference in the claim to the patient is not changing,

CHARLES P. McGUIRE, C.C.R.

49

and so when we're talking about reducing the incidence, it's still saying now there's a disconnect then, Your Honor, between the group as a whole and the individual patient that is claimed beginning the treatment.

So, really, the effect of the question is, if an M.D. is giving cangrelor to a particular patient, has the incidence been reduced?  And even if we accept the reducing the incidence part is for a group as a whole, because incidence is happening in groups is what I understand Your Honor to be observing, the problem with that is the disconnect with the rest of the claim here, which still says "the patient," and we've got the individual patient that we're supposed to measure this reducing the incidence of. So actually, that would show that the reducing the incidence is trying to capture a group, but the claim is still directed to an individual.  That's the disconnect here between what the claim is trying to cover and the tests that were done.

And the reason that Plaintiff sometimes does this, they choose to do this because, what is it that they want to show infringes?  If they want to focus on one individual, they can write a claim to one individual.  But then there's a lot of claims about administering particular doses of cangrelor to patients in need thereof.  That's one kind of claim.

CHARLES P. McGUIRE, C.C.R.

50

But another kind of claim is this one, where it's talking about reducing the group effect, which then really should have been addressed in the claim itself to a group, Your Honor.

THE COURT:  Continue.

MR. ALY:  Okay.  Thank you.

And so now we're looking at -- and let me point out another point, which is also from the Plaintiffs' responsive brief on page 26, and their responsive brief is DNA 6.  Plaintiffs there say the word "a" here, because it's "a" patient, can be one or more, and there are cases where it can be one or more.

We say that's modified here because of the word "the" patient, but also, if it's one or more, that still includes one.  And there's no support for how to measure this effect in one patient.  So even if "a" were to mean one or more, there still would have to be support for how to detect this decrease or reduction in one patient.

Let's go to slide 66, Your Honor, and this is where we're going to look at the specification.

And you're going to see the same type of thing in the Plaintiffs' slides, Your Honor, which is the specification, and that is proving the point here, which is, the support in the specification is all about to a patient population.  So, if they wanted, the Plaintiffs could have

51

matched what's in the specification using the words in the specification referring to populations, and here, they're referring to, for example, a plural word of "patients," or, if we're looking at the right side, a comparison of groups of patients here, which is the same group analysis. And then they would have drawn a claim to a group analysis.

Fortunately, the disconnect here, and it's a very legal issue, is, can they describe in the specification a group but then still claim the effect on an individual? And we're saying no, because that's the indefiniteness. There's no way in the patent on how to measure this effect in an individual.

And Plaintiffs really don't dispute that point. And the bottom line here is, if the claim is for a patient or one patient at least included within the scope, there's no support in the specification for how to determine that.

Next slide, 67.

Here, this is now a separate but related issue with the construction that the Plaintiffs are introducing other words just showing that the Plaintiffs are rewriting the claims sort of ad hoc by now putting in with a specified disease and within or during a specified period. It's just adding words, and it shows that the Plaintiffs understand there is a problem here, and they would like the claim to be rewritten to sort of patch up these indefiniteness problems.

CHARLES P. McGUIRE, C.C.R.

52

Slide 68 is referring to some kind of overlap that we would see if the reducing the incidence was given the broad meaning that Plaintiffs are providing, and it would really be more than overlap here, because if we're at the patient population and a set period of time, now we're unsure if the lowering occurred in that patient population, even, without this additional language from Plaintiffs, but then it overlaps with their own construction or preventing, which is shown in the lower right.

So there has to be a distinction between these two words and phrases because they're in the same claim. Reducing the incidence is one aspect, and preventing is another.

The next slide, 69, is now going to, it's largely the same issue, Your Honor, but I would say the next -- this is a different term from the '265 patent, a family of terms that are shown here.

Reducing mortality is what's common among the three. It is in different patents and different claims, but the issues are largely the same.

And here again, if we looked at claim 3, it's in a subject, and then two lines down, it's in the subject, and here we don't have the incidence any more, we have reducing mortality. So that's the difference. And when we're talking about reducing mortality, that is now going to be

53

very difficult to note in one particular subject.  That subject unfortunately either passes away or it doesn't pass away, and we don't know looking back if in that one did cangrelor have any effect in helping to reduce mortality or didn't it.  The specification doesn't teach how to do that in a particular patient, and yet that's what they claim.  They claimed the particular patient.

Next slide, 70, again, for these reducing mortality claims, we're going to see support from the Plaintiffs in the specification, but that is not at all about any individual analysis.  That is, again, for the individual -- sorry, for the overall population, and if they meant to cover the population, they could and should have claimed the population, and didn't.  It's not what they claimed.

Slide 71.  Here, it's showing that, again, when they were referring to a subject, they are pointing out it can be more than one or one or more, but that's in this -- constantly, this is, the one or more still includes the one.  That's the consistent point throughout here.  And either way, it's indefinite, because there's no way to know how to do this in one patient.

Perhaps recognizing this, we show here on the Plaintiffs' response brief that they're referring the "and" to how a subject is understood in the plural sense.  So now

CHARLES P. McGUIRE, C.C.R.

54

they're sort of turning on the head.  If "a" means one or more, under Plaintiffs' view, it would be understood in the plural sense to be only populations, and that doesn't make sense.  A subject has to at least include the one individual, which includes that indefiniteness issue.

Let's go to slide 73.

Skip 72.  We've already pointed out the issue here.

Slide 73 is a separate problem with a different claim term.  Now we're looking at the '265 patent, claim 13. Here, it's reduced over a period of about one year, and we're really trying to find out how would you know whether or not it's reduced to one year or not, whether or not, wherever you would have been is the same as where you were a year ago.  That's really difficult to do, and that's true even under Plaintiffs' construction.  As we see here in Plaintiffs' construction, it's saying, "to place back into a preferred position; to perform reduction."  We're not referring for this phrase in the general population, so it's very difficult now in this analysis at least for this claim to find out, how do we know if over the one year we went back to where we were?  Very hard to measure that, and impossible, making it indefinite from our point of view.

Next slide, 74.

This is for the same issue as far as reduced over

CHARLES P. McGUIRE, C.C.R.

55

a period of about one year.  We're looking for what happened in the one year, and there's nothing in the specification how to identify what happened within the one year to see if it's better or worse in an individual.

Next slide, 75, is another term that's related to these same issues.  This one has "reducing the risk" from the '780 patent.  Here, the dispute is slightly different because, please, Your Honor, note that Plaintiffs' construction for "reducing the risk" does not refer to a group or a population.  Here, they're changing the "reducing the risk" to a probability that an event will occur.  That's at the bottom.

And a probability that an event will occur, here, that could be a potential claim construction, but they really now need to show how do we determine the probability in an individual patient.

So now, here, there's not a dispute, at least Plaintiffs have not made the dispute live about whether the claim covers an individual or a patient.  It is a patient. But now it's saying if the probability will reduce in the individual patient, that's still not clear.  We have group data in the specification, but it is indefinite as far as it applies to an individual, because that individual, looking at this claim as an example, either has the myocardial infarction, that's the heart attack, either had that or not.

CHARLES P. McGUIRE, C.C.R.

56

Was that person's risk reduced?  Was the probability decreased or not?  Impossible to tell in any one individual case if that is what is claimed.

Next slide, 76.

For this "reducing the risk" issue, we're now looking at the specification and seeing that, actually, there's nothing in the specification about reducing the risk of individual side effects.  There is the reduced risk of mortality or reducing mortality generally, and we've talked about that as a separate claim term.  But that's what they're talking about in the specification, and yet the claim is referring to the reduced risk of a particular site, the heart attack, and we're not sure how to do that, and if there's no guidance on how to do that, it makes the claim indefinite.

The next slide is 77.  What we'll see is from the Plaintiffs' slides as well that they will point to a portion of the specification regarding efficacy, how it works, how it's treating the patient, but that proves a point that there isn't something here about the side effects here or whether the particular claimed side effects will be reduced in an individual.  There is no guidance for that, whether it's called risk or whether it's called probability, the word that Plaintiffs use.

And the next and last slide, Your Honor, 78, here,

57

the Plaintiffs continue to provide the best proof of the problem.  This is showing an article that Plaintiffs identified, which in that article describes risk reduction and when that is and what is intended and how it can be measured in the context of that article.

But in the specification, there is no discussion of this risk reduction.  That's why Plaintiffs are pointing to this article, and the only way they're saying this article is relevant, it's not by incorporation by reference or a definition of the term.  They're saying that the file history of the patent, somewhere in the patent prosecution this other article came up, and therefore, they should get the benefit of the doubt that their claim term means risk reduction, even though that is not what they actually claimed and they have no support for it in the patent specification.

So, Your Honor, I conclude for now this section, and we'll be back if there's any rebuttal to be had.

THE COURT:  Thank you.

MS. MURPHY:  Your Honor, I'll pick up where we left off.

You just heard a lot of argument on a number of terms.  Defendants are asking you to define a number of terms.

THE COURT:  Ms. Murphy, it's very tough for our

58

Court Reporter -- I notice your voice drops down a little bit.  Just try to, as you're speaking -- and we want to have a very clear record, so don't be afraid to be loud and, you know, speak slowly so we get an accurate record.  I note there is a lot going on here, but I would appreciate it if you would try to keep that in mind.

MS. MURPHY:  Thank you, Your Honor.

We believe it's inappropriate to address indefiniteness at this time.

All of these arguments you just heard are premature.  Courts in this district and in this circuit routinely defer consideration of indefiniteness until after claim construction proceedings and have found that it's more appropriately addressed at the summary judgment or after trial stage.  Why?  Because at that point, you have a fully developed expert record.

Here, we have no expert record.  Expert testimony has not even begun.  Neither party submitted any expert declarations in support of their claim construction, or, indeed, submissions.  What you just heard was entirely attorney argument.

We think it would be inappropriate for Your Honor to address indefiniteness at this time.

And we've cited these two cases on the slide here because we note that in this first case,

CHARLES P. McGUIRE, C.C.R.

59

Par Pharmaceuticals, which is an affiliated entity with the MSN group of Defendants, argued exactly what we're arguing here, which is that it's inappropriate to address indefiniteness in claim construction, and in the bottom case, Fresenius, which is affiliated with Gland here, also made that same argument.

So even according to Defendants, it's not appropriate to address indefiniteness at this stage of the proceedings.

Nevertheless, we have some legal standards here on indefiniteness.

It is Defendants' burden to show by clear and convincing evidence that a person of ordinary skill reading the specification would not understand with reasonable certainty the claim scope.

We disagree that that's been proven here.  Each of these terms, we believe, has a plain and ordinary meaning, and we've submitted dictionary definitions to that effect, and as Your Honor noted, those dictionary definitions support that, for instance, "reducing the incidence" applies to a population statistic.

I think it would be easier to just go through Defendants' slides at this point and hit on some of the points that they made.

So, starting here at slide 62 of Defendants'

CHARLES P. McGUIRE, C.C.R.

60

slides, they argue that indefiniteness is appropriate at claim construction.

I note that neither of these cases support that proposition or application of that proposition here.

Schering addressed indefiniteness at summary judgment, and it did it based on a complete expert record.

This other case, Cipher Pharmaceuticals, addressed indefiniteness at claim construction, but it did it based on, quote, "extensive expert testimony at the hearing."

Obviously we have no expert testimony here at this hearing. It's only attorney argument.

In their next slide, I note that only Gland is advocating that "reducing the incidence of" is indefinite. MSN does not take a position, they did not agree with their plain and ordinary meaning, but presumably, they disagree that the claim term is indefinite, and we believe that undercuts Gland's position.

Okay. So, slide 54, these are, as I understand, the main points that Defendants make in their indefiniteness argument. I'll take them one by one.

Defendants, or Gland, rather, made a big argument that "a patient" has to be singular.

We have cited cases in our briefing, among them 01 Communique, that stands for the proposition that "a patient" refers to one or more.

CHARLES P. McGUIRE, C.C.R.

61

And if you look at the '448 patent, the entire -- the examples describe clinical trials where effects of cangrelor were studied over a population.

So we think it's appropriate to treat "a patient" as one of our patients here, and that's supported by both legal authority and the intrinsic records.

The second point, Gland argues that there are no limitations directed at our dictionary definition of reduction -- reduction of the specified disease during a specified time period.

We disagree.  We think the claims themselves indicate what the specified events are being reduced, and we think the specification provides sufficient definitions to understand what that period is.

And finally, this last point, we disagree, as we did before, that there's any reason to impart a requirement of no overlap between "reducing the incidence of" and "preventing."  We think they are different terms.  They have different meanings.

Nevertheless, Gland appears to argue and suggest in this last point that they have the same meaning.  If they have the same meaning, it would seem to undercut Gland's argument that the first term, "reducing the incidence of," is indefinite.

And then just briefly, I will address their other

62

arguments as to reduced mortality.

Okay.  The '265 patent is similar to the '448 patent.  It describes the results of clinical studies that studied the effects of cangrelor over a certain patient population.

So, again, we believe it's appropriate to treat the claim as reducing the risk based on population-based statistics, and we have cited cases in our briefing to support this, most notably the GlaxoSmithKline and the Glenmark case, where arguments advanced by Defendants here were rejected there, and there, the Court find that decreasing mortality refers to a physician's attempt to decrease the likelihood of mortality in a particular patient, and, again, based on population-based statistics that are described in the specification.  So we think that that case controls here.

And then just one last point.  On this slide, we believe the '780 patent describes with reasonable certainty what "reducing the risk" means.  We believe "reducing the risk" has its plain and ordinary meaning, so we obviously disagree with Gland and MSN that this term is indefinite.

But I just wanted to point out that this article is actually part of the file history, so it's part of the intrinsic record, and it should be fair game to inform the meaning of "reducing the risk."

CHARLES P. McGUIRE, C.C.R.

63

And with that, I will turn it over to my colleague, Angus.

MR. ALY:  Your Honor, if I may just do a brief addressing of two points.

THE COURT:  Sure.

MR. ALY:  Okay.  Just two points, Your Honor.

One is just to clarify for the record here, there are several reducing terms that I addressed, and when counsel was identifying that Gland had a position unique, in other words, that MSN and Endo did not have a position on the term, it's only for one of the terms.  That's "reducing the incidence."  All the other terms that we talked about on this reducing an indefiniteness, all of the Defendants have the same position.

The second point to briefly address is that when we're talking about the claim terms here, we did not hear an explanation for how, if the claim is directed to an individual, and again, these are the words that the patentee chose to put for their claims, then is there a way to identify that in an individual.

And there isn't one.  There still isn't one, based on the argument in the briefing, and therefore, the claims should be indefinite as written.

THE COURT:  Thank you.

All right, guys, it's 11:30.  I'd like to take

CHARLES P. McGUIRE, C.C.R.

64

like a 10-minute break, and then we can resume at -- it's 11:26.  Let's resume promptly at 11:40.  Okay?

Thank you.

(Recess taken)

THE COURT:  All right.  Are we ready to go forward?

MR. CHEN:  Plaintiffs are ready, Your Honor.

MR. BERMAN:  Defendants are ready, Your Honor.

THE COURT:  All right.  Let's proceed.

MR. CHEN:  Your Honor, this is Angus Chen of Quinn Emanuel for Plaintiffs Chiesi.

If I may share my screen.

Are you able to see my screen?

THE COURT:  Yes.  Thank you.

MR. CHEN:  So, this is a slide that my colleagues showed earlier.

We just went through this top group of patents, the method of treatment patents.

We will now turn to this bottom group of patents in blue, which we call the high purity cangrelor patents. These are patents that are directed to either a composition of cangrelor with a defined purity level or low impurities, a product by process by which to make such compositions, and finally, a method of treatment using such compositions.  So that's why there's four patents there.

CHARLES P. McGUIRE, C.C.R.

65

Turning to our slides here, there's three terms at issue here, Your Honor.

The first term is "dissolving cangrelor and mixing a pH-adjusting agent"; the second term is "high purity cangrelor," and the third term deals with the excipients mannitol and/or sorbitol.

And the parties agreed that, if it's okay with Your Honor, for each term, we'll go back and forth between Plaintiffs and Defendants.

And so I'll turn to the first high purity term now, "dissolving cangrelor and mixing a pH-adjusting agent."

This term only appears in the product by process patent, the '687 high purity patent, because those are obviously process steps that are referenced in the product by process.

Chiesi's construction attempts to be consistent with the intrinsic evidence and stay consistent with the teachings that there's no particular order or combination that's required, and Defendants attempt to narrow the claims to a specific order where (a) has to happen before (b).

And this is just an illustration of the parties' competing constructions, and highlighted in red for focusing the dispute is, Chiesi's dispute recognizes that either (a) can be added to (b), or vice versa, (b) added to (a), or simultaneously, or a combination thereof.

CHARLES P. McGUIRE, C.C.R.

66

In contrast, MSN and Gland, both Defendants, assert that (a) must be followed by (b).

Your Honor, the next slide, 33, the top is Chiesi's -- the crux of Chiesi's construction, the crux of the parties' dispute that I just referenced where (a) can be added to (b), or vice versa, or simultaneously, or a combination. That's consistent with the specification which is excerpted below from the '687 patent, which says that -- for simplicity, I'll just keep on referring to them as the (a) solution and the (b) solution. The (a) solution may be added to the (b) or the (b) added to the (a), or simultaneously, or a combination thereof.

And so if you think about it in broad strokes, that's at least four general permutations or possibilities of the way that the dissolving and mixing may be conducted.

This is also consistent with another part of the specification --

My apologies. Is the Zoom blocking the slide, or you can see the full slide?

THE COURT:  I can see.  Thank you.

MR. CHEN:  And this is another part of the specification a few lines down, where, again, the patent is teaching you or a person of ordinary skill in the art that solution (a) can be formed during or after the addition of solution (b), vice versa, or simultaneously, or a

CHARLES P. McGUIRE, C.C.R.

67

combination.

And so the basic claim construction principle is that the claims should be construed as -- and where the patentee is entitled to the full scope and should be construed as broadly as possible absent any indication otherwise from the intrinsic evidence, and to the contrary, here, the intrinsic evidence has very -- teaches a variety of ways in which this mixing and dissolving can occur.

Now, Defendants will -- they raised an example in their response brief, an analogy of sweet tea and sugar, and I actually think that that example lends to our construction, because, if you apply that to the patent, it doesn't matter if you have the tea solution or the sugar first in the glass, and you can mix one before the other, or vice versa, or simultaneously, or some sort of intermittent combination.  And so that example actually supports our position, in our view.

Now, what's important is not these steps, as the patent teaches, but rather -- let me just pull up a part of the specification here.

This is from the '687 specification, column 18, I believe -- yes.  And what the -- this is the part that's talking about the fact that the solutions (a) and (b) can be mixed in any order.  What it says that is important in the first highlighted sentence is that the pH is controlled.

CHARLES P. McGUIRE, C.C.R.

68

That's what's important, not whether (a) is mixed to (b), or vice versa, or some combination.

And so as long as that teaching is kept in mind, then the order of mixing and dissolving doesn't matter, according to the patent.

And right after the sentence that I just highlighted is the last passage that was in my slide, talking about how the two solutions can be added during or after each other to satisfy the process.

And so the law supports Chiesi's construction because, as exemplified in the Taro v. Novitium case, if the intrinsic evidence is teaching that a solution may be prepared in any suitable manner, and that's precisely in different words what we just went through in the '687 specification, then the use of non-limiting language in the intrinsic evidence supports a broad construction that does not limit the method to a specific order, which is contrary to what Defendants proposed.

And so Defendants are effectively proposing that only one out of those four broad-stroke methodologies be imported into the claims, and thus narrowing the product by process claims.

And, Your Honor, with that, I'll turn it over to Defendants.

THE COURT:  Thank you.

CHARLES P. McGUIRE, C.C.R.

69

MR. BERMAN:  Good morning, Your Honor.

Rich Berman of Arent Fox on behalf of Defendants MSN and Endo.

As my colleague, Ms. Carlan, stated in her introduction -- first, a little background on the formulation patents.

Next slide, please.

As my colleague, Ms. Carlan, stated in her introduction, cangrelor was developed by AstraZeneca in the 1990's.  Chiesi did not develop this drug.  They bought it.  In fact, by 2000, AstraZeneca had already developed and patented cangrelor formulations.  These patents issued as the '208 patent and the '313 patent, and these are important pieces of prior art for claim construction, because the formulation patents try to distinguish from this prior art.

The formulation patents are all related and have the same specification.  They were filed by The Medicines Company, who owned the drug after AstraZeneca but before Chiesi, starting with the '687 patent, which issued in 2016.

In the background section, the patent states that impurities produced during AstraZeneca's manufacturing or compounding process, quote, "remain problematic," unquote.

The patent goes on to say that it is desirable to develop a compounding process that, quote, "consistently generates formulations having low levels of impurities,"

CHARLES P. McGUIRE, C.C.R.

70

unquote, to try and solve that problem.

Next slide, please.

And that's exactly what the formulation patents claim to have achieved:  A novel compounding process for preparing so-called high purity cangrelor.

Now, we'll talk more about the high purity cangrelor term later, but I first want to focus on the compounding process.

Next slide, please.

The formulation patents disclose that the compounding process has four separate steps.  Steps one and two require dissolving cangrelor in a solvent to form a cangrelor or first solution and preparing a pH adjusting agent.

The third step, which is the major focus of disagreement here, requires mixing the pH-adjusting agent with the cangrelor solution to form a compounding or second solution.

And the last step, which is not in issue here, requires removing the solvent from the compounding solution to produce the high purity cangrelor.

Next slide, please.

Claim 1 of the '687 patent mirrors the stepwise disclosure in the specification.  The claim is directed to a pharmaceutical formulation comprising high purity cangrelor

CHARLES P. McGUIRE, C.C.R.

71

that is prepared by a method comprising, step (a), dissolving the cangrelor to form a first solution; step (b), mixing a pH-adjusting agent with the first solution to form a second solution; and step (c), removing the solvent from the second solution to produce high purity cangrelor.

This claim is, as Mr. Chen said, a product by process claim, where the product here, high purity cangrelor, is claimed by the process used to prepare it.  In order to infringe such a claim, the accused infringer not only has to meet the limitations of the product itself, but also has to practice the process used to produce it.

And I know we're not litigating the issue of infringement here, but the scope of the process steps is obviously very important to determining infringement, and in these claim construction proceedings, the Plaintiffs are trying to broaden the scope of the '687 patent to cover production processes that are not directed to this specific process.

Next slide, please.

Now, turning to the terms themselves -- next slide -- the dissolving and mixing is obviously the first we'll address.

And the dispute between the parties, as Mr. Chen stated, is whether steps (a) and (b) must proceed in the recited order, dissolving step (a), following by mixing step

CHARLES P. McGUIRE, C.C.R.

72

(b), or whether the mixing step (b) can occur prior to making the first solution in step (a), as Plaintiffs contend.

Next slide, please.

Defendants' proposal that the dissolving step (a) and mixing step (b) must occur in the recited order is correct because that construction is consistent with the intrinsic evidence, the patent claims themselves and the specification, and it's consistent with how the patentees distinguish the patent from the prior art and specifically AstraZeneca's patents from back in 2000.

Next slide, please.

First, let's look at the claim language itself.

The claim sets forth three steps, and the result of each step is used in a subsequent step.  The first step, (a), requires dissolving cangrelor to form a first solution; the second step, (b), requires mixing a pH-adjusting agent with that first solution to form a second solution, and the third step, (c), requires removing the solvent from that second solution.

So clearly step (b) requires that the first solution had to be formed in step (a), and step (c) requires the second solution that was formed in step (b).

According to the case law, such as the Wi-Lan and Amgen cases that we cited in our briefing, this type of

CHARLES P. McGUIRE, C.C.R.

73

language requires the steps to be performed in that order.

Next slide, please.

Moving to the specification, the only disclosure as to how to form a second solution -- I'm sorry, going back -- going to the next slide.  Slide 89, please, yes.

Moving to the specification, the only disclosure as to how to form the second solution is by mixing the pH-adjusting agent with the cangrelor first solution, or, according to the specification, the first solution must have been formed before the second solution can be formed.

Next slide, please.

In addition, the patentee distinguished AstraZeneca's old compounding process from the claim compounding process, initially in the background section, as I've already discussed -- next slide, please -- but again, later in the patent, AstraZeneca's '313 patent discloses cangrelor formulations having pH of from about six to about 10, which fully covers the '687 patent's claimed pH range of about 7 to 9.5.

So, how does the '687 patent distinguish from the '313 patent?

The '687 patent says that the distinguishing factor is that, according to the '687 process, the pH range must be maintained, quote, "throughout the process."  In other words, the process steps matter to achieve the final

CHARLES P. McGUIRE, C.C.R.

74

product.

So, according to the patent, the process steps must be performed in the recited order, as Defendants propose.

Next slide, please.

Plaintiffs, on the other hand, attempt to redraft the claim by changing, quote, "the first solution," unquote, in step (b) to, quote, "a cangrelor solution."

This may seem like a minor change, but it is a significant change, because it changes the order in which the steps may be performed, and as I said previously, the case law requires that claims drafted like the '687 patent require the steps to be performed in order.  Plaintiffs' redraft tries to remove that legal requirement, which is improper.

Next slide, please.

In addition, Plaintiffs have already admitted in their response to Defendants' invalidity contentions that the steps of the claimed methods must be performed in the recited order to distinguish from AstraZeneca's '208 and '313 patents.  Plaintiffs said that AstraZeneca's patents do not disclose dissolving cangrelor in solution, quote, "followed by," unquote, the mixing step.

Plaintiffs should not be allowed to interpret the '687 patent one way to avoid invalidity and another way to

75

try to prove infringement.

Next slide, please.

And finally, I wanted to clear up any confusion that Plaintiffs were saying about the mixing step.

Plaintiffs say that Defendants' construction requires a particular order of mixing in step (b), but that is not at all what Defendants are saying.  Defendants agree with Plaintiffs that the mixing may occur by any of the ways highlighted in the specification there in column 15, lines 45 through 46, and column 18, lines 27 through 45.

The key is when the mixing step occurs, not how it occurs.  The specification is clear:  The mixing step three must occur after the cangrelor solution is formed in step one.

Next slide, please.

In conclusion, Defendants' construction is consistent with the intrinsic evidence and how the patentees distinguished the patent from AstraZeneca's prior art patents, while Plaintiffs' construction ignores this evidence and tries to introduce confusion where there is none.

And with that, I'll turn it back over to Plaintiffs.

MR. CHEN:  Your Honor, I'll briefly just address that last term and then switch to the next term, high

CHARLES P. McGUIRE, C.C.R.

76

purity.

First, as to the statements in our contentions, there was no claim construction interpretation there, Your Honor.  We were responding to Defendants' invalidity arguments.

THE COURT:  Mr. Chen, could you keep your voice up a little bit?

MR. CHEN:  Yes.  Sorry.

We're responding to Defendants' invalidity arguments.

Secondly, as Defendants' own slide shows, the way that the patentee distinguished the AstraZeneca prior art was, as I said in my opening presentation, that the focus is on the control of the pH.  So I think the parties are in agreement there.

And then lastly, if the issue is about when the mixing occurs, Defendants pointed Your Honor to column 18, which is exactly the column that we focused on in our presentation, and unlike the cases that Defendants cite, they pointed to no support for why column 18 should be ignored as to the teaching that (a) can be mixed with (b), or vice versa, or any combination thereof.  And those two packages in column 18, I think the parties agree, are informative.

With that, I'll turn to the next term, high

77

purity.  I'll share my screen.

The next term, Your Honor, is found in all four of the high purity patents, so it's not only found in the product by process patent that we just discussed, it's found in the two composition patents that deal with the high purities as well as the method of treatment using a high purity composition.

And what Chiesi proposes is that it should be defined and understood as cangrelor having low levels of impurities, in essence, and the Defendants, we note, are not exactly on the same page here.  Gland says the term is indefinite, and while Gland says a construction can't even be proposed, MSN says a construction can be proposed, but they disagree with Chiesi, and what they effectively propose is the same process steps that we just saw in the product by process patent.

The support for Chiesi's construction is taken from the intrinsic evidence.  This term is not expressly defined in the patent, Your Honor, so, you know, we tried to stay as true and consistent with the intrinsic evidence as possible, and we relied on the passages that talked about low levels of impurities.  So, when the patent term talks about high purity cangrelor and then low levels of impurities, that's two sides of the same coin, in our view.

And what happens is, I believe the Defendants

78

argue that, well, it doesn't give any meaning, our construction doesn't give any meaning.

But actually, this is the antecedent basis, the high purity cangrelor, to, as an illustration, the second "wherein" clause here in this claim term, claim 1 of the '575, where it then goes on to further define the levels or the ceilings for the impurities.  So there is meaning with our construction.

What MSN proposes to do is -- their construction here is on the right -- is to take this "high purity cangrelor" term and then convert it into these process steps that we just talked about in the product by process patent. So they want to convert the composition patent, such as the '575 and the '921 patents, into the same product by process patent as the '687 patent.

And as a matter of basic grammar, what they're proposing is legal error, because they're converting a noun, an article of high purity cangrelor, into a verb, a process which us patent lawyers call a product by process.

And this is illustrated by the fact that if you take that same claim that we just saw a moment ago, and that's on the left of this slide, this also applies to the other composition patent, the '921 patent, but we've just used the '575 as an illustration.  Everything in bracketed and bold here in the first half or so of the claim is

CHARLES P. McGUIRE, C.C.R.

converting MSN's construction to what would otherwise be a composition form, a formulation claim.

And on the right, for comparison, is claim 1 of what the parties agree is the product by process claim, which naturally recites the process steps.

So the net result is, MSN is trying to take away separate and individual patents and property rights that Chiesi has. Chiesi has two separate formulation patents and a separate product by process patent, and MSN's construction seeks to conflate all of them into the '687 product by process patent.

The other issue and legal error that they urge the Court to commit is, now, if you look at the '687 patent -- I apologize, Your Honor, I didn't have a citation in this slide, but for the record, the claim on slide 41 is a rewritten version of claim 1 of the '687 patent. This chart can also be found in Appendix G of Chiesi's opening claim construction brief.

And what we've done here is added MSN's construction to the already recited process steps in the '687 patent. And what you can see is, on the bottom, the three steps, dissolving, mixing, and removing, are already written into the '687.

So what MSN's construction results in, then, is an unnecessary and superfluous repetition of those three steps

80

again.  Those are highlighted up top in the bolded language.

And that's legal error, Your Honor, because it is generally improper to construe a patent claim such that express claim limitations or elements are rendered superfluous.

Now, in anticipation of Defendants' argument, they rely heavily on two things that I'd like to address now.

One is the Medicine v. Mylan Federal Circuit case on a different patent and a different drug.

Your Honor, I can enlarge that if you can't see it.

THE COURT:  I'm good.

MR. CHEN:  Okay.

So, in this case, this is a copy of The Medicine Company's case at 1303.  That's a different issue, because, in that case, the term was "batches," and there, the patent, unlike in our situation, expressly defined the term "batches."  And as the Federal Circuit recognized, that express definition of the term "batches," in quotes here, referred to a compounding process.  So then it went on, the Federal Circuit went on to conclude that a process was already part of the definition and it was okay in that patent, a different patent, to refer to process steps for the batch.

That's not the case here.  High purity is not

CHARLES P. McGUIRE, C.C.R.

81

defined, let alone defined by a process.

The other thing that Defendants rely on is something from the European prosecution, the related European filing of a related patent to the patent-in-suit, and they rely on statements that we made during that European filing.

I think, though, it's a little bit unfair to take that statement out of context, because what really should be noted is that the context for the discussion in the European file history was the product by process claim.  That claim, which is excerpted in Appendix B of our responsive claim construction brief, Chiesi's responsive claim construction brief, is highlighted here, and the "EP" stands for the European patent, and there, that patent is analogous to our '687 product by process patent.  So that patent specifically recites process steps, dissolving, mixing, removing, unlike our formulation patents, the '921 and the '575, which do not recite process steps.

So it's important to keep that statement in context.

Lastly, let me quickly address Gland's indefiniteness arguments.

As we understand Gland's indefiniteness arguments, they assert that the term "high purity cangrelor" is indefinite because there is no time frame associated with

CHARLES P. McGUIRE, C.C.R.

82

the analysis or assessment of the impurities.

What that argument ignores, Your Honor, is that the depending claims do recite the time frame.

And here is the '921 patent, a handful of claims that talk about after a period of 12 months, and they don't offer any expert opinions in support of their indefiniteness arguments.

The same thing with the '575:  A handful of claims that recite either a period of six months or 12 months, and, again, no expert opinions to support their indefiniteness argument.

And with that, I will turn it over to Defendants.

MR. BERMAN:  Thank you.

Your Honor, I'd like to turn to the "high purity cangrelor" term, and then my colleagues at Gland will handle the indefiniteness issue that Mr. Chen was discussing at the end of his presentation.

Turning to the term "high purity cangrelor," first, again, to emphasize, as has been pointed out, this is MSN/Endo's argument, but we certainly join Gland's argument that the term is indefinite if the Court does not adopt our proposal.

As I previously discussed, the '687 patent is a product by process patent, and the three other formulation patents do not explicitly require the method steps (a), (b),

CHARLES P. McGUIRE, C.C.R.

83

and (c).

Next slide.

It's MSN/Endo's position, however, that, based on the intrinsic and extrinsic evidence, the proper construction requires the process steps used for making it. Otherwise, the claims fail to distinguish from AstraZeneca's prior patents.

And Plaintiffs' proposed construction, on the other hand, includes the vague language of cangrelor having low levels of impurities, which I'll also address.

Next slide, please.

The specification supports MSN/Endo's construction because the patentees made it clear that the process is an essential part of the patent. It was the problem to be solved by the patent, and the process was what distinguished "high purity cangrelor" from AstraZeneca's patents.

Next slide, please.

The Andersen Corporation case that both parties cited in their briefing states that process steps can be treated as part of a product claim if the patentee has made it clear that the process steps are an essential part of the claims.

And that is exactly what the patentees did here. The patents say high purity cangrelor is produced using a, quote, "novel compounding process," unquote. The patents

CHARLES P. McGUIRE, C.C.R.

84

also emphasize that it is critical that processes be put in place to manufacture high purity cangrelor.

And in another section, the patentees point out that cangrelor produced by the process disclosed in the invention remains stable, and this supports the use of the process to make high purity cangrelor.

These passages, which emphasize the criticality of the process steps for producing high purity cangrelor, support MSN/Endo's construction.

Next slide, please.

The formulation patents also make it clear that the problem to be solved was making cangrelor via a special compounding process that generated low levels of impurities, and as the case law states, this disclosure is a relevant consideration for claim construction.

Next slide, please.

And while, of course, not binding here, that same language was in the Medicines Company v. Mylan case, and that supported construing the claims to products produced by the process.

Now, as Mr. Chen pointed out, those are not exactly the same facts, but it is exactly the same language that is in the TMC case, as here, about developing a compounding process that consistently generates formulations having low levels of impurities.  Same language.

CHARLES P. McGUIRE, C.C.R.

85

Next slide, please.

And as I've already discussed, the patentees distinguish high purity cangrelor made by the new process from AstraZeneca's '313 patent because the process for making those prior formulations is, quote, "insufficient to ensure the desired, low levels of degradants are reached," unquote.

Similarly, in the Medicines Company case, the patentees had distinguished prior art formulations of the drug Angiomax from the claim formulations, which were prepared using a different process.  The Court there construed the claims to require formulations made via the new process.

Similar facts, not the same facts, but similar facts should yield the same result.

Next slide, please.

And the foreign prosecution that Mr. Chen referred to does support Defendants' construction.  We have the additional admissions, which the case law states are relevant to construction of the U. S. patent, and during prosecution of this European version of the '687 patent, the same patentees, as Mr. Chen stated, the applicant stated that if a different process is used, a different product is obtained.

So high purity cangrelor requires the process by

CHARLES P. McGUIRE, C.C.R.

86

which it's made.

Next slide, please.

The Medicine Company case states that when certain process steps are indicated as required for generating a claimed product, the claim is properly limited to products prepared by those steps.  So here, the three steps required to produce high purity cangrelor must be included in the term.

Next slide, please.

Plaintiffs' proposal that "high purity cangrelor" merely means cangrelor having low levels of impurities is overbroad and it adds no meaning.

Next slide.

Plaintiffs' construction is overbroad because it fails to distinguish high purity cangrelor from AstraZeneca's prior cangrelor formulations which also had low levels of impurities.

Next slide.

Further, the formulation patents have data on cangrelor batches produced according to the patent as well as those that are not produced according to the patent, and both types have low levels of impurities.  So simply having a low level of impurities does not make cangrelor into high purity cangrelor.

Next slide, please.

CHARLES P. McGUIRE, C.C.R.

Plaintiffs' construction also adds no meaning to the claim.  There's simply no guidance as to what level of impurities is a low one.  It is a term of degree.

Next slide, please.

So, in conclusion, MSN/Endo's construction is consistent with the evidence, while Plaintiffs' construction is overbroad and adds no meaning.  MSN/Endo's construction should therefore be adopted.

Thank you.

THE COURT:  Thank you.

MR. CHEN:  Your Honor, I'll briefly respond and then turn to the next term.

MR. MOHAN:  Mr. Chen, I believe that's me.  Sorry.

Your Honor, Arun Mohan for Gland from Schiff Hardin on behalf of Gland.  I'm here to argue the indefiniteness of the "high purity cangrelor" term, which, as my colleague Mr. Berman stated, Endo and MSN does join if the Court does not adopt their constructions, so the parties are aligned on this.

As a threshold matter, I'd like to address the argument that Plaintiffs have raised regarding the need for expert testimony.

Similar to the reducing terms that my colleague, Mr. Aly, had discussed earlier this morning, we don't believe that expert testimony is needed now -- needed at

88

this time to determine the indefiniteness of this term because the patent's intrinsic evidence on its own renders the claim term indefinite, and I will explain that in my presentation today.

If we go to the next slide, slide 111, the issues here are pretty straightforward, as you've probably seen in our brief.  We argue the term is indefinite because whether a formulation has high purity cangrelor depends on the time that the period of the formulation is measured, but the patent claims do not specify the time for measurements.

If we could go briefly to Plaintiffs' slides, slides 44 and 45, if you can pull that up on my end, Mr. Chen points to dependent claims, so that there is a time frame.

But if you read these claims closely, it states, after a period of about 12 months, and then the following slide says, at least about six months.

So the time period actually here is also not clear.  It could be six months or it could be any time after six months, or it could be 12 months or any time after 12 months.  So the time frame doesn't -- the time listed in these claims don't really help Plaintiffs' argument that the terms are not indefinite.

If we can go back to our slides.  Thank you.

A second issue I will address very briefly, and

CHARLES P. McGUIRE, C.C.R.

89

it's in our brief, but I'll just touch on it, Plaintiffs' construction is also inconsistent with the patent claims. They tend to include an "or" where an -- sorry, an "and" where an "or" should be, so we'll talk about that briefly at the end.

If we go to the next slide, you'll see here that the patents admit that the level of degradation increases over time. On the left side is a quote from the '687 patent at column 24, line 23 to 25, specifically stating "the presence of degradants will increase over time..." And table 4 of the '687 patent on the right side of this slide actually shows highlighted here that the degradations will increase over time. So there is data that shows this.

So a person of ordinary skill in the art could make a formulation at time zero and could measure the formula, the purity at that point, but that degradation is going to change, and depending on the time frame you measure it, it could meet the limitation of that claim or it could not. And the fact that the claims don't tell you when to measure the purity renders this claim indefinite .

And if we go to slide 113, Plaintiffs actually admit in their responsive brief that high purity cangrelor can be measured at multiple time periods, and actually, they cite to table 5, example 6 of the '687 patent that shows measurement up to at least 36 months. So they admit that

CHARLES P. McGUIRE, C.C.R.

90

degradation can be measured over a period of time.

And I also point to the specification of the '687 patent that discusses that the level of degradation should be maintained over a period of time.

So it's not just initially or it's not just three months or six months.  It needs to be maintained for a period of time, but the patent claims don't give you that period of time.  And so that is clearly a fatal flaw in the claim term.

And if I can just briefly address slide 114, the following slide, the minor point, Plaintiffs are attempting to rewrite the claim by -- concerning that cangrelor and one or more salts thereof, where the claims actually say high purity cangrelor or a salt thereof.  So it has to be one or the other, and Plaintiffs are trying to argue that it can be both or it should be both.

So for those reasons, we believe that the claim terms -- the claim "high purity cangrelor" is indefinite, and the Court should find that at this stage.

Thank you.

THE COURT:  Thank you.

MR. CHEN:  I apologize for jumping the gun a moment ago.

Your Honor, in response to the Defendants' arguments, the short version is, what you're hearing is

91

invalidity arguments in disguise under the claim construction stage.

I'll start first with the indefiniteness arguments.

I really don't see what the issue is with those dependent claims that would cite six months or 12 months. It says quite clearly, at least six months. So if you measure the impurities at the six-month time point and it satisfies the specific recited impurities, then we're within the claim. The same thing after 12 months: At the 12-month period, you measure the impurities, you've satisfied the claim.

As to MSN's arguments, yes, we have a novel process that is captured in the '687 product by process.

That does not mean, though, that the resulting formulation to define the impurity levels is -- should also -- or it does not mean that we should not have a patent on the resulting formulation as well. What they oversimplify and generalize is the low impurities. What they didn't show you is that there's five specific impurities recited in each of the claims, A, B, C, D and E. Each of those individually has a limitation, and then there's a collective cap on the total amount of those impurities.

And so that's what's different from the prior art. If Defendants really believe that there's an invalidity

CHARLES P. McGUIRE, C.C.R.

92

argument because of this AstraZeneca prior art, then that's not a claim construction argument, Your Honor, that's invalidity, and they shouldn't be permitted to short circuit invalidity through claim construction and conflating other patents.

With that, I'll turn to the last term in these high purity patents.

The last term, Your Honor, is the mannitol and/or sorbitol claim.

The issue here really centers around the claim term "and/or."  And so highlighted in color to help illustrate or focus the dispute is that Chiesi says it can be either/or or both mannitol and sorbitol, whereas both Defendants say it can be either one or the other but not both, meaning there's a negative limitation in their claim construction that excludes both mannitol and sorbitol.

And Chiesi's claim construction is consistent with the intrinsic evidence.  Look no farther than the dependent claims.  We've highlighted the '921 patent here on the left, but we can also easily look at the '575 patent and the same claim numbers 14 and 19, and 14 says mannitol and/or sorbitol, and claim 19 expressly, it couldn't be any more clear, says the excipients are mannitol and sorbitol.

And so Defendants' construction is inconsistent with at least claim 19 of both the '921 and the '575 patents

93

insofar as being contradictory to those claims, and thus the intrinsic evidence.

Chiesi's construction is also consistent with the specification where its disclosed embodiments include not just individually mannitol or sorbitol but also both mannitol and sorbitol, and excerpted on the left are two excerpts from the high purity patents contemplating that both excipients may be or are an embodiment.

Again, MSN and Gland's construction excluding the combination is improper because it excludes these embodiments. And so their negative limitation, their negative construction is rarely if ever correct, and certainly here they haven't proven why or shown why that this should be the exception and a negative construction should be adopted.

And specifically disclosed embodiments are excluded for their construction without any support.

With that, Your Honor, I'll turn it over to the Defendants.

MR. FRESE: Thank you, Your Honor.

Several of the formulation patent claims include these claims that are directed to formulations consisting of mannitol and/or sorbitol as a pharmaceutically acceptable excipient, and that's where Defendants' focus is, on the claim language that says that there is a pharmaceutically

CHARLES P. McGUIRE, C.C.R.

94

acceptable excipient.

Next slide, please.

Plaintiffs assert that by excluding combinations of mannitol and sorbitol from the claimed formulation that Defendants are introducing a negative limitation.

But the claim language consisting of that transitional phrase does exactly that.  It means, I claim what follows and nothing else.

Because the claims recite consisting of a pharmaceutically acceptable excipient, that is, singular, they mean consisting of only one pharmaceutically acceptable excipient.

This principle comes from the Norian Corp. v. Stryker Corp. case, which is excerpted at the bottom of the slide here.  There, the claims recited compositions consisting of a sodium phosphate.  The accused product, by contrast, had a mixture of sodium phosphates.  The Court found that the claim language consisting of in combination with a sodium phosphate excluded mixtures of sodium phosphates.

The next slide.

The formulation patent specifications and the Plaintiffs both acknowledge that mannitol and sorbitol are two excipients.  The specification refers to them as two excipients or excipients, plural.  Claim 19 of the '921

95

patent refers to them as excipients, plural.  They do not together form a pharmaceutically acceptable excipient.

Next slide, please.

Plaintiffs rely really heavily on claim 19 and say that because claim 19 recites that there are pharmaceutically acceptable excipients in claim 14 that claim 14 must cover multiple excipients.  But claim 14 is not drafted that way.

Likewise, Plaintiffs point to this embodiment in the intrinsic evidence where the formulation contains mannitol or sorbitol or both mannitol and sorbitol, but that does not say anything about both mannitol and sorbitol together forming one pharmaceutically acceptable excipient.

Moreover, Plaintiffs could have drafted the claim directed to exactly that language, or they could have left out the term, a pharmaceutically acceptable excipient.  They did not.

Next slide.

Finally, in their responsive brief, Plaintiffs point to the plain and ordinary meaning of the term "and/or" and say that must mean the claims encompassed combinations of excipients.

But that would turn the phase, a pharmaceutically acceptable excipient, which appears in these claims, into one or more pharmaceutically acceptable excipients.  And

CHARLES P. McGUIRE, C.C.R.

96

Plaintiffs are already asserting other claims with that language, such as claim 1 of the '921 patent.

Moreover, the use of the term "and/or" does not by itself permit combinations. If the claim read, one of mannitol and/or sorbitol, it would clearly encompass formulations having one or the other, but not both.

Put more simply, one of mannitol and sorbitol means the same thing as one of mannitol or sorbitol. And this reading of "and/or" here is more consistent with the claim as written, whereas Plaintiffs' reading would transform "an excipient" into "one or more excipients."

Next slide, please.

Plaintiffs' construction at its basic level would rewrite the claims. As the Hoganas case shows us, since Plaintiffs were responsible for drafting and prosecuting several of these patent claims, they had the duty to draft them clearly, and the Court should not interpret the claims to correct any error.

Defendants' construction is consistent with all the words in the claims, specification, and properly gives meaning to the claims.

Thank you. With that, I'll turn it back over to Plaintiffs.

THE COURT: Thank you.

MR. CHEN: Your Honor, just briefly, I wanted to

CHARLES P. McGUIRE, C.C.R.

raise, on Defendants' slide 119, where they made the "consisting" argument, their passage in the specification that they cite, the '921 patent, indeed uses the word "consisting" and then goes on to say, "or both mannitol and sorbitol."

THE COURT:  I'm sorry, Mr. Chen.  Please keep your voice up a little bit for Chuck.

MR. CHEN:  I'm sorry.

The part of the specification that they cite to uses the word "consisting" and then goes on to say, "including both mannitol and sorbitol."

And then the last thing is, I believe we cite in our briefing the fact that the case law supports the word "a" being used for one or more, and that's the 01 Communique case.

Your Honor, with that, we're done with the high purity patents, unless you had questions, and I'd like to turn it over to my colleague, Ms. Verano.

THE COURT:  We're good.  Move forward.

MS. VERANO:  Okay.  Can you see my screen?

THE COURT:  We can.

MS. VERANO:  Okay, great.

Good afternoon, Your Honor.  As my colleague Mr. Chen said, I'm Hailey Verano with Quinn Emanuel on behalf of the Plaintiffs, and I'll be discussing the single

CHARLES P. McGUIRE, C.C.R.

98

term that's at issue in the '208 patent.

For a bit of background, the '208 patent is asserted only against Gland in this case, so there are only two proposed constructions here, Gland and Chiesi.

So the '208 patent, which we referred to earlier as the cangrelor patent, is directed to a pharmaceutical composition comprising a compound and one or more glass forming additives, and that's the term that Gland proposed for construction here, "glass forming additives."

As I'll explain, Chiesi has proposed a construction consistent with the specification of the '208 patent, and Gland's construction, on the other hand, is inconsistent with the specification and improperly excludes the preferred embodiment.

So, Chiesi's proposed construction for the term "glass forming additives" includes sugars or polymers with glass transition temperatures above room temperature in addition to the specifically enumerated examples from the specification.

So, while Gland's construction may appear shorter, it's, in fact, narrower than Chiesi's.  Gland's construction is more limiting than Chiesi's because it excludes preferred embodiments that are listed in the specification.

So both of the parties' constructions include additives with glass transition temperatures above room

CHARLES P. McGUIRE, C.C.R.

temperature, but Chiesi's construction builds on Gland by including two phases separated by the word "or."

Chiesi's construction also includes specific glass forming additives listed in the specification.  So as I'll explain, Gland's construction excludes at least one of these listed additives, sorbitol, because it doesn't have a glass transition temperature above room temperature.

So the core issue is whether it's proper to exclude embodiments listed in the '208 patents in the specification if they don't have a glass transition temperature above room temperature.

Gland admits in its briefing that this is the main disagreement, but fails to provide support for exclusion of this embodiment.

For reference, this is claim 1 of the '208 patent. This is the only independent claim in this patent, and the other eight are dependent on claim 1.

So I think that Chiesi's construction is taken directly from the specification of the '208 patent.  This is the same portion of the specification that Gland cites to in their briefing, and there are a few things specifically that I'd like to point out here.

The first, you'll see there are portions of this excerpt underlined in red.  You can see that Chiesi's construction aligns with the underlined phrases.

CHARLES P. McGUIRE, C.C.R.

100

And I'd like to again point out that Chiesi's construction uses the word "or" to capture both of these underlined phrases, whereas Gland's construction, in contrast, cherry-picks one phrase and leaves out the rest, focusing only on above room temperature.

I'd also like to flag a couple of additional items in this portion of the specification.

So, first, the specification explicitly names suitable glass forming modifying agents.  This list includes sorbitol.

Second, this specification provides an explanation of what it means to be above room temperature.

And, third, in describing the glass transition temperature of a suitable glass forming agent, the specification uses the word "generally," meaning that while such additives generally have glass transition temperatures above room temperature, they don't necessarily have to have glass transition temperatures above that temperature.

So, Gland may raise a concern with the word "generally" here.  However, I'd like to note that it doesn't appear in either party's construction.  I point to it only to make clear that Gland's construction is overly limiting. They haven't and they can't provide any basis for exclusion of the preferred embodiments described in the patent.

Gland's position improperly excludes a preferred

101

embodiment.  Sorbitol, as I just showed you, is explicitly named in the specification as a suitable glass forming modifying agent.  The parties agree that sorbitol does not have a glass transition temperature above room temperature.  So Gland's proposal would limit glass forming additives to those having a glass transition temperature above room temperature, and would thus exclude sorbitol.

So, applying the law of claim construction to these facts, the Federal Circuit has made it clear that a construction should not exclude preferred embodiments absent highly persuasive evidentiary support.  There's nothing that Gland can point to in the intrinsic record that merits excluding sorbitol, and, in fact, Gland bases its argument on the same portion of the specification that we have been discussing.

The two cases that Gland points to, Dow and Modine, explain that what is patented is not restricted to the examples, and we agree with that.

It's Gland that's trying to limit the '208 patent.  Chiesi's construction allows for glass forming additives to fall within either the general criteria championed by Gland, or the list specifically included in the specification, and Chiesi's construction does not limit glass forming additives to this list.

Gland provides no support for exclusion of

CHARLES P. McGUIRE, C.C.R.

102

sorbitol, which is the preferred embodiment specifically exemplified in the specification.  Gland may raise some other issues here, but the core issue is whether the glass forming additive claimed in the '208 patent include the specific examples listed in the specification of that patent.  Gland hasn't provided support for exclusion of sorbitol, and its construction is therefore improperly narrow.

Chiesi's construction is proper.  It's Gland's proposed construction that's improperly narrow.  Chiesi's construction includes, specifically exemplifies glass forming additives and accounts for the specification general criteria related to glass transition temperature.

We've also included a summary slide at the end of our PowerPoint dec, and we'd be happy to answer any questions regarding the items listed here with any additional time.

Thank you.

THE COURT:  Thank you.

MR. MOHAN:  Your Honor, Arun Mohan for Gland again.  I'm here to address the '208 patent term, glass forming additives.

I would respectfully disagree with Ms. Verano that our term -- our construction is overly narrow.  In fact, I would argue that it is Plaintiffs' construction that is

CHARLES P. McGUIRE, C.C.R.

103

narrow and that it only includes examples of glass forming additives, and our construction, on the other hand, is taken specifically from the definition given in the patent specification.

So, unlike "high purity cangrelor," which Mr. Chen stated earlier today, which is that patents did not give a definition, the '208 patent gives a clear definition for glass forming additives, and that is what our construction is.

This first slide here, slide 122, highlights glass forming additives in claim 1 and then gives the two constructions, and as you'll see in the next slide, slide 123, the patent clearly states on '208 patent at column 4, line 25, "A glass forming modifying agent -- " -- which the parties agree is the same thing as a glass forming additive -- " -- suitable for use in the present invention is generally one which has a glass transition temperature of above room temperature," and that's the language we use in our construction for this term.

Plaintiffs add more especially above 50 degrees Celsius, but that really is just a subset of what room temperature is.  Room temperature is, depending on how you like your room, between 20 and 25 degrees Celsius.  Fifty degrees is clearly above that, and so that is included in that in our construction, so there really is no difference

104

and no need to include 50 degrees Celsius.

If we go to slide 124, you'll see clearly -- these are, first off, is the reason why Plaintiffs' construction does not conform.  As I said, their construction only includes examples of glass forming additives, and their construction, as Ms. Verano admitted, includes a compound, sorbitol, that has a glass transition temperature clearly below room temperature.  In fact, it's not even close.  It's negative two degrees Celsius, whereas room temperature is between 20 and 25 degrees Celsius.

If we go to slide 125, I've highlighted here in the '208 patent at column 4, line 25 to 39.  Plaintiffs get their construction from this highlighted section, which says "examples of suitable modifying agents," and says it includes sugars or polymers.

Now, that means that a glass forming modifying agent or a glass forming additive could be something besides a sugar or a polymer.  In fact, the first sentence says an agent is one which has a glass transition temperature of above room temperature.  It doesn't specify sugars or polymers.

So, Plaintiffs are clearly just trying to limit it to the examples that they want in this case for their purposes.

But that's not the point of claim construction.

CHARLES P. McGUIRE, C.C.R.

The point of claim construction is to take what's in the patent specification and intrinsic evidence and use that as the construction.  And as Mr. Chen pointed out, there is a clear definition here for glass forming additives, unlike in high purity cangrelor.  It says, it is one which has a glass transition temperature of above room temperature.

If we go to slide 126, Plaintiffs' construction invites serious invalidity issues by including excipients with a glass transition temperature of below room temperature.  As Ms. Verano admitted, as Plaintiffs admitted in their briefing, sorbitol is clearly below room temperature and it would not be part of the definition.

But the point of claim construction is to provide a definition of a term.  It's not to list examples.  And the clear definition of the term in the patent is one which has a glass transition temperature of above room temperature.

As Ms. Verano alluded to also, the claims -- the patent specification does say "generally," but that really just broadens things, and as Ms. Verano pointed out, that's not in either construction.  So we don't believe "generally" should be part of the construction, and actually, it invites more issues with indefiniteness if you include that, so we've agreed that should not be part of the term.

And with that, I revert back to Ms. Verano.

MS. VERANO:  I have just a couple of statements to

106

make in follow-up.

Mr. Mohan stated that Chiesi's construction only includes examples, and as I pointed out in our slide presentation, that's incorrect.  Our construction specifically uses the term "or" to introduce the possibility of the preferred embodiments listed in the specification in addition to the general criteria used by Gland in their construction.

Gland points to the same portion of the specification that we do, and they have provided no evidence of disclaimer or prosecution history estoppel, that being no highly persuasive evidentiary support in support of a construction that excludes a preferred embodiment listed in the specification, here, sorbitol, and they therefore haven't met the standard for limiting the meaning of this term to only those additives with glass transition temperatures above room temperature.

THE COURT:  Thank you.

MR. CHEN:  Your Honor, this is Angus Chen of Quinn Emanuel.

THE COURT:  Mr. Chen, you've got to keep your voice up for Mr. McGuire, okay?  I know it's hard on a computer because we're not in a courtroom, but he has to still take it down.

MR. CHEN:  That concludes the disputed terms.

CHARLES P. McGUIRE, C.C.R.

107

Certainly given the choice, I'm sure the interns and summers would have preferred "My Cousin Vinnie" over this presentation, but that concludes the disputed terms, Your Honor.

Thank you for your time.

THE COURT:  Thank you.

Anything else from the defense end?

MS. CARLAN:  Nothing from MSN/Endo.  We appreciate your time, Your Honor.

THE COURT:  Well, I do think it was exciting, and I think it was very well done.  It was clear to me that you've put a lot of careful thought into the presentations. They were all excellent.  So, thank you for that.  It was not "My Cousin Vinnie," but court is not always theater. Court is court.  And these are important issues.

And I am pleased that my law clerks and my interns got to see such excellent advocacy today, so I thank you all for that, and excellent briefing.

And we will put this at the top of our priority list and try to get an opinion out as soon as possible.  All right?

Thank you, everyone.

(Matter concluded)

CHARLES P. McGUIRE, C.C.R.

108

Pursuant to Section 753, Title 28, United States Code, the foregoing transcript is certified to be an accurate record as taken stenographically in the above entitled proceedings.

s/CHARLES P. McGUIRE, C.C.R.

CHARLES P. McGUIRE, C.C.R.